756 A.2d 1019 (2000)
334 N.J. Super. 13
Betsy BLUME, Plaintiff-Appellant/Cross-Respondent,
v.
DENVILLE TOWNSHIP BOARD OF EDUCATION and Sandra Dohrenwend, Defendants-Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued January 20, 2000.
Decided July 31, 2000.
*1020 Arthur L. Raynes, Morristown, argued the cause for appellant/cross-respondent (Wiley, Malehorn and Sirota, attorneys;
*1021 Mr. Raynes, of counsel; Mr. Raynes and Elizabeth H. Reich, Union, on the brief).
Glenn R. Moran, Cedar Knolls, argued the cause for respondents/cross-appellants (Leary, Bride, Tinker & Moran, attorneys; Mr. Moran, of counsel; Mr. Moran and David J. Dering, Elizabeth, on the brief).
Before Judges BROCHIN, EICHEN and BILDER.
The opinion of the court was delivered by BROCHIN, J.A.D. (retired and temporarily assigned on recall).
After having worked since 1967 primarily as a classroom teacher in the public schools, plaintiff Betsy Blume was hired by defendant Denville Township Board of Education to fill its newly created position of Vice-Principal for Instruction and Curriculum. She was initially hired under a oneyear contract for the 1992-1993 school year. Her employment contract was renewed for the 1993-1994 school year. Formal written evaluations of Ms. Blume's performance were prepared primarily by defendant Sandra Dohrenwend, the Denville Superintendent of Schools. After the Board had considered those evaluations and Ms. Dohrenwend's "qualified" recommendation to renew Ms. Blume's contract for one more year, the school board voted unanimously in April 1994 not to renew.
The recommendation that Ms. Dohrenwend communicated to the Board of Education prior to its April 1994 vote was "qualified" by comments about Ms. Blume's shortcomings. Ms. Blume alleges that this "qualified" recommendation was a signal to the Board not to continue her employment.
Ms. Blume sued the Denville Township Board of Education and Ms. Dohrenwend for compensatory and punitive damages. Ms. Blume alleges that the Board's decision not to continue her employment violated New Jersey's Law Against Discrimination, N.J.S.A. 10:5-1 to -49, because it was induced by Ms. Dohrenwend's prejudice against her because she is Jewish and because, during her second year of employment, she suffered from a recurrence of breast cancer which required her to undergo a second mastectomy. She also argues that the non-renewal of her contract is illegal because the decision was taken by the Board of Education in retaliation for her complaint to the Board that the negative evaluations which she received from Ms. Dohrenwend were motivated by anti-semitism and by the fact that she had a recurrence of cancer.
The case was tried to a jury. At the close of the entire case, the trial judge dismissed the claim of retaliation and declined to submit the issue of punitive damages to the jury, but he reserved judgment on defendants' motion for the entry of judgment in their favor as a matter of law. The jury found that "Sandra Dohrenwend... discriminate[d] against plaintiff because of religion and/or handicap," and it awarded Ms. Blume $380,000 in compensatory damages.
Defendants then renewed the motion they had previously made for the entry of judgment, and they moved for judgment notwithstanding the verdict or, alternatively, for a new trial on the ground that the verdict was against the weight of the evidence. Plaintiff moved for entry of judgment in accordance with the jury verdict, for attorneys' fees and interest, and for a new trial solely on the issue of punitive damages. The court granted defendants' motions for judgment in their favor pursuant to R. 4:40-1 and -2, and it denied plaintiff's motion.
The court's oral decision on defendants' motions did not deal with their alternative motion for a new trial. The written order which the court entered in accordance with its oral decision granted defendants' motions for judgment pursuant to R. 4:40-1 and -2, but the court struck out of the proposed form of order the provision which would have granted defendants' alternative motion for a new trial. *1022 Plaintiff appealed from the judgment in defendants' favor. After plaintiff had filed her notice of appeal, defendants moved before the trial court to settle the form of order. The trial court granted that motion and entered an order which recites that "having granted judgment N.O.V. to defendants, and as required by R. 4:40-2(b), should that judgment N.O.V. be reversed or vacated, defendants' motion for a new trial as to all issues is hereby granted;...."
Plaintiff argues to us that "the JNOV should be reversed and the jury verdict reinstated"; "the trial court erred procedurally and substantively by granting defendants' untimely alternative motion for a new trial"; and, in the event of a remand, plaintiff's claim for punitive damages should be submitted to the jury, the trial court's orders dismissing plaintiff's claim for retaliation and denying plaintiff access to Ms. Dohrenwend's personnel file should be reversed, and attorneys' fees, costs and interest should be granted. On cross-appeal, defendants argue that "should this matter be remanded for a new trial, the plaintiff should be compelled to produce her evaluations from her prior and subsequent employers, as same are clearly relevant to the defense of this matter."
We will first consider plaintiff's appeal from the entry of judgment as a matter of law under R. 4:40-1 or as a judgment notwithstanding the verdict under R. 4:40-2. In reviewing the trial court's decision under those rules, we must accept as true all the evidence which supports the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced therefrom. Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969); see also Lewis v. American Cyanamid Co., 155 N.J. 544, 567, 715 A.2d 967 (1998). If reasonable minds could find in favor of the party who gained the verdict, the motion must be denied. Dolson, supra, 55 N.J. at 5-6, 258 A.2d 706; see also Lewis, supra, 155 N.J. at 567, 715 A.2d 967.
The following are the facts of the case as plaintiff is entitled to have us view them for purposes of her appeal from the trial court's entry of judgment as a matter of law. In describing Ms. Blume's performance, we will rely primarily on documentation in the record, including principally the formal evaluations of her work that were prepared by Ms. Dohrenwend and George Deamer, Principal of Valleyview School. This material presents a picture that is largely favorable to Ms. Blume and is consistent with her own appraisal of her performance as she testified to it in court. Ms. Dohrenwend's testimony and the testimony of other defense witnesses contradicted that picture and there is some contemporary documentation critical of Ms. Blume in some respects, but the jury was free to accept the evidence that was favorable to her, and that is what it evidently did.
The Denville school district has approximately 1000 students in three schools, Valleyview School, which is the middle school, and Lakeview and Riverview Schools, which are the elementary schools. Valleyview has a staff of about forty persons and the other two schools have a staff of about twenty persons each. Before Ms. Blume was hired, the total administrative staff of the district consisted of School Superintendent Sandra Dohrenwend, Business Administrator and Board Secretary Miles Josephson, Valleyview School Principal George Deamer, and a principal for each of the two elementary schools.
Ms. Blume's duties as Vice-Principal for Instruction and Curriculum were to function as Vice-Principal of Valleyview School, helping Mr. Deamer, primarily with school discipline, and as Director of Curriculum for the school district, to upgrade the curriculum, which had not been modernized for a number of years.
Ms. Dohrenwend interviewed Ms. Blume and the Denville Board of Education hired her on Ms. Dohrenwend's recommendation. *1023 After Ms. Dohrenwend had offered her the position, but before the Board had approved and before Ms. Blume had signed her employment contract, Ms. Blume told Ms. Dohrenwend that she had been treated for cancer by undergoing a mastectomy of her right breast and that she would need time off from work for reconstructive surgery. The jury could have found that Ms. Dohrenwend learned that Ms. Blume was Jewish only some time after she had been hired. She learned in the early fall of 1993, her second year of employment, that she was suffering from a recurrence of cancer that would require a second mastectomy, and she told Ms. Dohrenwend shortly thereafter.
Ms. Dohrenwend's first written evaluation of Ms. Blume, dated November 4, 1992, was enthusiastic. It was signed by Ms. Dohrenwend as the evaluator and by Ms. Blume to indicate she had read it. Ms. Dohrenwend wrote:
Mrs. Blume has demonstrated initiative, creativity, and enthusiasm in her approach to her new position during the past three months.
She has been eager to learn the operations of Valleyview, has been willing to assist the principal at all times, and has made an effort to develop a positive working relationship with faculty and staff....
....
With regards to the Valleyview instructional program, Mrs. Blume has been instrumental in the organization of program review meetings with science teachers, as they prepare for curriculum review. She has secured sample texts and materials from publishers and speakers to address the new for new [sic] facilities. She has met with English and Reading teachers, as they review and analyze last year's Early Warning Test. She has been active and supportive in the organization of the Middle School Task Force, and has shared in the leadership of the guidance committee. She worked with Mr. Deamer to facilitate reorganization of the Author's Day program, and initiated the use of voting machines.
With regard to district wide staff development, Mrs. Blume initiated a major review of our technology programs and has assisted with the development of the language arts committee....
....
Mrs. Blume's first few months as a Vice-Principal for Curriculum and Instruction have resulted in a significant contribution to the educational goals of our district. She has worked very well in an unusually complex and demanding position, and she shows strong promise of becoming an excellent administrator.
The second written evaluation of Ms. Blume, prepared by Mr. Deamer, was almost equally enthusiastic. It was signed by Mr. Deamer as evaluator and by Ms. Blume to acknowledge having read it. Both signatures are dated February 22, 1993. Mr. Deamer wrote that Ms. Blume "has quickly established herself as a hardworking professional who is willing to totally dedicate herself to the improvement of the instructional program." However, this evaluation contains at least a hint of a reservation on Mr. Deamer's part about an activity that later became a subject of adverse comment:
She has also worked very closely with the members of the Valleyview science team. Although it has been a struggle for her at times, she has managed to pull the team together and now has them focused on textbook selection and curriculum revision. This has been the focus all along but at times it appeared that the process would take one step forward and two in reverse.
The next written evaluation, dated April 16, 1993, states that it is a joint evaluation to which both Ms. Dohrenwend and Mr. Deamer contributed, but it is signed only by Ms. Dohrenwend and Ms. Blume on April 26,1993. It reads in part:
*1024 Mrs. Blume has served very effectively in the curriculum coordinator role in the eight months since she joined the district. She has initiated and assisted with a number of curriculum projects, and has worked cooperatively with other administrators on a wide range of district projects. These include the math curriculum and pilot projects, the middle school science curriculum and pilots, the guidance committee, the technology committee, the language arts committee and the gifted and talented programs. She has also worked closely with the child study team on several efforts related to problems of students or groups of students, including reorganization of the approach to offering Basic Skills instruction and Resource Room instruction. She has been a strong resource to the teacher of the new class for students classified as emotionally disturbed. Mrs. Blume has been enthusiastic about sharing with all staff her information about new developments in education and available workshops and conferences. She contributes actively to principal's meetings and has made several presentations to Board committees and at Board meetings.
Mrs. Blume is well-informed and sets a good example as an enthusiastic adult learner, seeking every opportunity to become better informed on critical issues. Her work in the curriculum area has enabled district staff to move ahead in several key areas, and the amount of progress this year is due in large degree to her indefatigable efforts.
Mr. Deamer's portion of the joint evaluation was signed by Mr. Deamer on April 26, 1993. The evaluation reads in part as follows:
Mrs. Blume continues to make a major contribution to the Valleyview educational program. She is an excellent curricula resource and has helped a number of teachers who have come to her with specific requests for materials. She has also had a major impact in the area of staff development, not only through her work in the curriculum revision areas, but she has also helped by keeping the staff informed of workshops and conferences in the area which would benefit their programs.
....
As far as Mrs. Blume's duties as viceprincipal, she has provided a great deal of assistance to me. She has handled her share of the discipline problems and has handled them with aplomb, being careful to call the parents of those students with whom she has dealt....
Another area in which she has provided much assistance is that of observations. This has been a new experience for Mrs. Blume and she has done a good job....
RECOMMENDATIONS FOR IMPROVEMENT;
A. Mrs. Blume is unaware of it but there are times when speaking to an individual or a small group that she comes across as being too domineering and/or authoritative. This sometimes leads to the person or group to whom she is speaking being offended. I know that she is unaware that this is happening because I have spoken to her about it and she has agreed to some introspection on this subject.
B. I would like to see Mrs. Blume have more contact with the students during their special periods, i.e., early in the morning and at lunchtime. In fairness to her, this has been an exceptional year in terms of the number of curriculum areas being studied. I do not want Mrs. Blume's relationship with the students to be confined to her role as disciplinarian.
The next written evaluation of Ms. Blume is dated April 21, 1993. It was prepared by Ms. Dohrenwend. Her signature is dated April 22, 1993. Ms. Blume's signature on the April 21, 1993 evaluation memo is dated April 26, 1993, the same date on which she signed the April 16, *1025 1993 evaluation. Ms. Dohrenwend testified that this additional evaluation memorandum was occasioned by an incident which occurred after she had written the April 16, 1993 evaluation and which arose out of preparations for "Author's Day."
"Author's Day" was an annual event at the Valleyview School. A contemporary author would visit the school, speak to the students and autograph his or her books. Before Ms. Blume arrived, the faculty ran the program. Ms. Blume arranged to have the author chosen by the students who would use a voting machine to make their selections. The PTA would sell the autographed books to the students to raise money for the school. The difficulty arose because Ms. Blume, unaware of the practice of selling the books, distributed them to the students without charge to be read before the invited author arrived. As a result, there was a verbal exchange between Ms. Blume and Marion Cunic, one of the PTA co-presidents. How loud, how heated and how public the exchange was, are subjects of dispute. The trial record includes a June 29, 1993 letter from Ms. Cunic to Ms. Blume thanking her for her "help & input over the past year, especially regarding Author's Day." The letter comments, "You brought some fresh & new ideas to this project and it was most beneficial to the students to have your ideas implemented." The jury could reasonably have accepted Ms. Blume's testimony that the exchange, although it concededly took place in the school cafeteria, was not loud, heated or very public.
The April 21, 1993 evaluation states:
One problematic area which took a great deal of Mrs. Blume's time, and which has been an area of difficulty for some years, was that of Author's Day. In the past there has been conflict between the Friends of the Library, the PTAs and the staff at the school who worked on the project. Board members have not always been happy with the process, and administrators have voiced some concern also. Mrs. Blume was given the task of working with the PTA presidents on the project this year and has worked hard to make the event a success. The effort has not been without problems this year either; some of the school's efforts have antagonized the PTA presidents and the school has not managed all matters as the PTA would have wished. Mrs. Blume found herself at the center of this conflict, and received a fair amount of criticism, in spite of her efforts to help.
To Mrs. Blume's credit, she brought some of the problems to the attention of the Superintendent after one of the parents became publicly critical. Mrs. Blume, Mr. Deamer and I have discussed the problems and have concluded that some of them quite likely could not have been avoided. We have agreed on alternate approaches for other problems, should they recur in the future. Retrospectively, we have encouraged Mrs. Blume to turn to her supervisors for assistance any time a situation like that seems to get out of control, especially when parents or members of the public are involved. Mrs. Blume, in an effort to improve the situation, has reached out to the parents, appropriately, to assure them of her support and her eagerness to make Author's Day a success.
The next evaluation of Ms. Blume, prepared by Ms. Dohrenwend, is dated February 1, 1994. Its conclusions, too, are positive:
Mrs. Blume has several important accomplishments in the area of curriculum leadership over the last six months.... Mrs. Blume also helped organize the Curriculum Council, chaired meetings, took responsibility for minutes....
Mrs. Blume developed an annual budget for curriculum and staff development activities by working with the principals, the superintendent and the business administrator....
Mrs. Blume has taken the leadership role in developing an action plan for coordination of district staff development *1026 plans and building and district objectives....
Mrs. Blume has also taken responsibility for setting up several workshops: math, computer, calculators....
....
Mrs. Blume was an enthusiastic supporter of the bond referendum and was helpful in providing information about the science and technology aspects of the referendum.
....
The Princeton Leadership Project and the Middle School Leadership Team have taken a great deal of Mrs. Blume's time since June and she has contributed significantly to the accomplishments of the group.... One major outgrowth of the summer project has been Mrs. Blume's closer and more comfortable working relationship with many Valleyview staff members.
....
Mrs. Blume assumed an important responsibility when she developed the program for the January staff development day. She contacted speakers, established schedules, secured materials and equipment and conducted registration....
Mrs. Blume has helped to coordinate the early plans for Author's Day. This is an important project for students which involves members of the community. The early reports are that all factions seem to be working smoothly together, which is important.
Summary:
Mrs. Blume has contributed a great deal of time to the Valleyview activities in her role as Vice-Principal, which has cut into her time this fall for curriculum projects. She has also had some absences, but, she has been conscientious about meeting her obligations and has made a significant contribution in several areas mentioned above. She will pick up on the other responsibilities this winter and spring.
Recommendations:
....
3. Pay special attention to wording and usage of written materials; check first for clarity and precision of phrasing, then for accuracy.
4. Continue with efforts to maintain open working relationships with supervisors and other administrators; take the effort to ask for conference or clarification or direction when needed.
5. You have made significant progress in your development of interpersonal skills this year, especially with Valleyview teachers. This is an important area that is fundamental to the success of any administrator and deserves continued nurturing.
Ms. Dohrenwend's and Ms. Blume's signatures on this evaluation are both dated February 3, 1994.
The next written evaluation which Ms. Blume received was prepared by Mr. Deamer and is dated only "February, 1994." It is short. It notes that "[e]ven though [Ms. Blume] experienced a health problem, it did not affect her job performance nor did she allow it to affect her attendance record to the detriment of her many responsibilities." Under the comment, "The following are some of the duties [Ms. Blume] has ably performed this year," the evaluation lists fifteen tasks which Ms. Blume accomplished. Mr. Deamer's recommendations for improvements are, "Try to establish reasonable priorities to better respond to needs of students, teachers, administrators and parents, and still have time to respond to personal goals."
The evaluation memorandum prepared by Ms. Dohrenwend, dated February 28, 1994, is of an entirely different character from the ones which preceded it. It describes a February 17, 1994 conference between Ms. Dohrenwend and Ms. Blume as follows:
We were not able to have a calm conversation on the 17th. As soon as I *1027 mentioned a concern or suggestion for improvement, you became angry and defensive about my comments, you interrupted me repeatedly, you denied the validity of my observations and you finally said I had to look at the issue from your point of view. At that point I suggested that perhaps it was time for you to give some respectful consideration to my point of view, given that I am the Superintendent and your supervisor. The conversation I had hoped for had become an argument; I finally concluded it. I asked that we meet together every Tuesday morning in the future to develop a plan for addressing these problems.
The evaluation memorandum criticized Ms. Blume for inadequate involvement in curriculum work and for communicating with the principals by written memoranda rather than by telephone or in person. For the first time, an evaluation memorandum written by Ms. Dohrenwend commented adversely on Ms. Blume's "interpersonal skills":
Interpersonal relations in general have been a problem for you for most of the last year and a half, and we have discussed it repeatedly.... Among the basic requirements are that one must carry one's own load, listen to others, respect their concerns and interests, support their efforts, assist them when possible, avoid duplicity, work hard, meet deadlines and be straight with others. There are also many instances when one should accept advice from one's supervisors.
....
From the day you joined our staff, Betsy,.... I have quietly cautioned you when you have used a heavy-handed approach which upset parents or Board members; I have defended you when others criticized you;.... I have praised your accomplishments in my evaluations and have been gentle in addressing your shortcomings. I have even taken on some of your responsibilities, such as the editing of minutes or letters or brochures, or conducting Curriculum Council meetings.
Ms. Blume responded to these criticisms, denying most of them and explaining or excusing the others. The jury was entitled to credit her response.
Mr. Deamer's final evaluation of Ms. Blume's work is undated, but it refers to Mrs. Blume's "completing her second year at Valleyview as Vice-Principal/Curriculum and Instruction." On the whole, it is quite complimentary. Mr. Deamer wrote:
I have found that [Ms. Blume] has completed the responsibilities assigned to her with zeal and in a conscientious manner. She is a person who takes great pride in what she does. She is interested in much more than simply completing a taskshe wants the job to be done well and takes great pride in doing so. These tasks have included staff observation/evaluation, committee work and grant work.
....
I feel that improvement is needed in the area of interpersonal skills. Mrs. Blume's considerable expertise in a number of areas is sometimes overshadowed by the manner in which her message is delivered. It is wise to realize that, although we may disagree with those to whom we are accountable, it is important that the disagreement not appear to be confrontational. This is something I believe can be easily improved because I have seen improvements in this area as it pertains to the faculty and parents.
Ms. Dohrenwend's final evaluation of Ms. Blume, dated April 8, 1994, noted her "accomplishments in the area of curriculum leadership" and in various other areas of her responsibility. It also mentioned areas of "shortfall or concern." The concerns which Ms. Dohrenwend expressed relate to the clarity and correctness of Ms. Blume's writing and to her personal relations *1028 with other administrators and teachers. The memorandum continues:
One other area of p[e]rsonal development must be mentioned. Mrs. Blume finds it difficult to participate in a discussion where she feels her actions will be or are being criticized or where corrections are recommended. As a result, she has several times asked that such a discussion be adjourned or postponed to another time, or has found herself angry or in tears and unable to continue. It is important that she develop a mature, professional approach to these discussions because they are intended to help her recognize problems and grow from the discussions.
The memorandum concludes with Ms. Dohrenwend's "qualified" recommendation for Ms. Blume's continued employment:
Because of Ms. Blume's strong commitment to the Middle Grades Project, her support of the district's curriculum initiatives, and her stated intention to work to improve her interpersonal skills, I am recommending her contract renewal. This is a qualified recommendation in that it would be necessary for significant improvement to occur in the stated areas if I were to recommend a tenure contract at the end of the 1994-1995 school year.
In Ms. Blume's response to this evaluation, she accused Ms. Dohrenwend of prejudice against her because she had a recurrence of cancer and because she is Jewish.
Ms. Dohrenwend's signature on this evaluation is dated April 11, 1994. Ms. Blume's signature is dated April 12, 1994. According to the minutes of the Denville Board of Education, the Board met in executive session on the evening of April 11, 1994. The pertinent portion of the minutes reads as follows:
The superintendent stated that despite some reservations about Mrs. Blume's performance, she was recommending her for a third year contract with the expectation that .... it would be necessary for significant improvement to occur in the stated areas if she would recommend a tenure contract for the 1994-95 year. The majority of the Board members stated that her evaluations did not show that she had performed extremely well; that ... she had fallen short in key areas of performance. They stated that her interpersonal communications were poor. They further stated that Mrs. Blume had not been successful in getting staff to work together for development of curricula to improve the staff's instructional techniques. Mrs. Blume was described as a "mediocre surly individual"....
... Mrs. Blume's personality was described as "contentious".
....Mrs. Blume's presentations were described as not of exceptional calibre and lacking in motivation and enthusiasm.
At a Board meeting held April 18, 1994, the Board members voted seven to none against accepting Ms. Dohrenwend's recommendation to offer Ms. Blume re-employment for the 1994-1995 school year. In response to Ms. Blume's request for a statement of the Board's reasons for terminating her employment, the Board sent her a letter prepared by its secretary stating reasons for its action. These were that her evaluation does not show performance at the expected level; poor interpersonal communications; failure to get the staff to collaborate on developing new curricula and methods of instruction; inappropriate telephone calls to Board members to complain about relations with Ms. Dohrenwend; failure to "demonstrate ... outstanding qualities as reflected in your prior evaluations"; displaying poor interpersonal skills including inappropriate comments in her rebuttal to her next-tolast evaluation and inconsiderate scheduling of meetings; failure to be a "teacher of [the district's] teachers" and a lack of initiative, "a conclusion which has also been reflected in all of your previous evaluations." *1029 Subsequently, the Board voted to hire two people to replace Ms. Blume, a fulltime Director of Curriculum and Instruction and a separate full-time Vice-Principal for Valleyview. When it became clear that the Board would not renew Ms. Blume's contract, she obtained letters of recommendation from the principals of the two Denville elementary schools. James J. Clayton, Principal of the Lakeview School, wrote, "Betsy's competence, enthusiasm, organizational abilities, and personality have made the task of reviewing our current curriculum and piloting textbooks not only manageable but enjoyable. Her people skills, coupled with her expertise in the area of mathematics/science education make her an invaluable asset to any district." Gene Beverly, Principal of the Riverview School, wrote,
Mrs. Blume has a great deal of initiative and energy. She is willing to work hard at finding solutions to difficult problems. She is conscientious and has high interwork [sic] standards. She also has a rich base of experience and background that allow her to bring a wide variety of ideas to discussions and problem-solving.
The tenured teachers of the Valleyview School signed a letter that is highly complimentary to Ms. Blume. It concludes, "Demonstrating patience, hard work and honesty, Mrs. Blume has achieved a trusting and respected rapport with teachers, parents and students of Valleyview Middle School." The members of a Valleyview School "Middle Grades Project Team," including Principal Deamer, wrote, "With no reservations we fully endorse Mrs. Betsy Blume for any administrative position for which she applies."
The evidence which we have summarized is more than ample to support a conclusion that Ms. Dohrenwend's and the Board of Education's ostensible reasons for terminating Ms. Blume's employment were spurious. Ms. Blume contends that the jury's rejection of those reasons as pretextual is, by itself, sufficient to sustain the verdict in her favor even if we were to agree with the trial judge that the evidence does not provide a rational basis for inferring that her termination was motivated by bias against her because she is Jewish or because she suffered from a recurrence of cancer.
The argument in support of this contention runs as follows. Because defendants' reasons for terminating Ms. Blume are pretextual, this is a "pretext case" like McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Ms. Blume established a prima facie case of discrimination in violation of the New Jersey Law Against Discrimination by showing that she is Jewish and that she suffered from a recurrence of cancer, that her employment was terminated, that the jury could find she was competent to do her job, and that she was replaced by one or more other persons. See Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, 462, 744 A.2d 1186 (2000); Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 597, 538 A.2d 794 (1988). In Fleming v. Correctional Healthcare Solutions, Inc., 164 N.J. 90, 101, 751 A.2d 1035 (2000), in which the plaintiff claimed that she had been illegally dismissed from her employment in retaliation for "whistle-blowing," our Supreme Court quoted with approval from the United States Supreme Court's decision in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407, 418 (1993), an employment discrimination case, that
the "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional [discrimination].[1] Thus, rejection of the defendant's *1030 proffered reasons will permit the trier of fact to infer the ultimate fact of intentional" [discrimination].[2]
In the present case the jury evidently disbelieved defendants' proffered reasons for terminating Ms. Blume's employment and must have suspected Ms. Dohrenwend and the Board of "mendacity." Therefore, Ms. Blume asserts, the jury's "rejection of the defendant's proffered reasons ... permit [ted] the trier of fact to infer the ultimate fact of intentional discrimination." Cf. Greenberg v. Camden County Vocational & Technical Sch., 310 N.J.Super. 189, 708 A.2d 460 (App.Div.1998) (denying school board's summary judgment motion dismissing LAD claim of teacher who was not rehired for tenure year). But cf. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312-13, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 439 (1996) ("[T]he prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion ....,'" citing International Brotherhood of Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396, 429 (1977) (emphasis added)); see generally Jessica Mollie Marlies, The Whys of Lies and Vaughan v. Metrahealth: Can an Employer'sLie be Used to Make an Inference of Discrimination?, N.C. L.Rev. 2246 (1999).
Despite its superficial plausibility, we reject the argument that proof an employer terminated a person in a protected class, that she was competent to perform her job and that she was replaced by someone else is always sufficient to support a jury verdict for the employee under the New Jersey Law Against Discrimination if the jury disbelieves the reasons proffered by the employer. Suppose for example Ms. Blume were neither Jewish nor "[h]andicapped." Nonetheless, her employment was terminated and she would be within a "protected class" because she is a woman. Goodman v. London Metals Exch., Inc., 86N.J. 19, 32, 429 A.2d 341 (1981); Kiss v. Department of Community Affairs, 171 N.J.Super. 193, 199, 408 A.2d 450 (App.Div.1979). But logic and justice rebel against the conclusion that if Ms. Blume's gender and the termination of her employment were the only proven facts, a jury who disbelieved the Board's excuses for not renewing her contract could, solely because of that disbelief "accompanied by a suspicion of [defendants'] mendacity," St. Mary's Honor Ctr., supra, 509 U.S. at 511, 113 S.Ct. at 2749, 125 L.Ed.2d at 418, properly find that she had been illegally discriminated against in violation of LAD.
In McKenna v. Pacific Rail Service, 32 F.3d 820 (3d Cir.1994), the Court of Appeals reversed a jury verdict in favor of plaintiff employees who were suing for discrimination under the New Jersey Law Against Discrimination. Because jurisdiction was based on diversity of citizenship, the Circuit Court was compelled to predict how our Supreme Court would interpret the New Jersey Law Against Discrimination. Its prediction was that our Court would hold that the jury's finding the employers' reasons for non-hiring to be pretextual is not a sufficient basis for a verdict in the employees' favor. Id. at 828. On the strength of that prediction, the Court of Appeals held that the trial court had erred by "propounding jury instructions that would entitle the plaintiffs to judgment if they merely presented a prima facie case and demonstrated that the defendant's asserted grounds for decision were pretextual." Id. at 831.
Our Supreme Court's opinion in Mogull, supra, 162 N.J. 449, 744 A.2d 1186, appears to have validated that prediction. The Court in Mogull approved jury instructions that "if you are to find for the *1031 plaintiff you must determine that the reasons CB has given for its actions are not the true reasons but that they are only offered so as to cover up or justify defendant's discrimination." Id. at 465-66, 744 A.2d 1186. The Court then went on to declare, "[I]n most circumstances, a finding that a defendant had failed to meet its burden of production would not equate to a plaintiff's proving that the defendant had discriminated." Id. at 469-70, 744 A.2d 1186 (emphasis added).
In Reeves v. Sanderson Plumbing Products, Inc.,___U.S. ___, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the United States Supreme Court considered whether proof of a prima facie case of employment discrimination plus the jury's rejection of defendants' reasons for firing the employee are sufficient to permit a jury verdict in favor of the employee. Our New Jersey Supreme Court adopted the burden-shifting scheme of McDonnell Douglas Corp., supra, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, as the model for cases alleging violations of the New Jersey Law Against Discrimination. Bergen Commercial Bank v. Sisler, 157 N.J. 188, 210, 723 A.2d 944 (1999); Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492, 446 A.2d 486 (1982); Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 83, 389 A.2d 465 (1978). Therefore, although federal decisions are not dispositive of any issue in the present case because it was tried and decided entirely on the basis of New Jersey law, the Reeves, supra, decision is significant for our consideration of Ms. Blume's argument that the trial court's decision is wrong, regardless of whether or not the record as a whole provides rational support for a finding of illegal discrimination.
Reeves, supra, was a case of discrimination under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.A. §§ 621 to 634. The jury returned a verdict for the plaintiff and the District Court denied the defendant's motion for judgment as a matter of law. Reeves, supra, ___ U.S. at___, 120 S.Ct. at 2104, 147 L.Ed.2d at 114-15. The Fifth Circuit Court of Appeals reversed, entering judgment for the defendant. Ibid. The Supreme Court granted certiorari "to resolve a conflict among the Courts of Appeals as to whether a plaintiff's prima facie case of discrimination (as defined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)), combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination." Reeves, supra, ___ U.S. at ___, 120 S.Ct. at 2104, 147 L.Ed.2d at 115. The Supreme Court's conclusion was that proof of those two elements of a discrimination case, i.e., a prima facie case of employment discrimination plus a rejection of the employer's explanation, would usually, but not invariably, suffice to support a plaintiff's verdict.
Id. at ___, 120 S.Ct. at 2109, 147 L.Ed.2d at 120-21. The Supreme Court declared:
This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory....
Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

[Ibid.]
In Reeves, supra, the Supreme Court ruled that the Court of Appeals had "erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination" in *1032 addition to a prima facie case and proof that the employer's explanation was mendacious. Ibid. But that conclusion did not decide the case. Having enunciated a rule of law, the Court proceeded to answer the "remaining question ... whether, despite the Court of Appeals' misconception of petitioner's evidentiary burden, respondent was nonetheless entitled to judgment as a matter of law." Ibid. The court then summarized the evidence tending to show age discrimination and held that it was sufficient to support the jury's verdict. Id. at___ __ ___, 120 S.Ct. at 2110-12, 147L.Ed.2d at 121-24.
Ms. Blume's argument in the present case is the converse of the Reeves, supra, holding reversing the Fifth Circuit's decision. According to the Supreme Court, the Court of Appeals was wrong in concluding that a plaintiff in an employment discrimination case must always prove more than a prima facie case of discrimination and a basis on which the jury can rationally find that the employer's explanation is a lie. Id. at___, 120 S.Ct. at 2109, 147 L.Ed.2d at 120-21. Ms. Blume argues that the probative value of the evidence is never material once the plaintiff has proved a prima facie case and evidence from which the factfinder can infer the intentional falsity of the employer's explanation. The United States Supreme Court's statement of the law, like that of our own Supreme Court, is to the contrary. We therefore reject Ms. Blume's "shortcut" prescription for upholding her verdict and proceed to analyze the record to determine whether, considered as a whole, it provides adequate support for either of plaintiff's discrimination charges.
The following is the evidence cited by Ms. Blume to support her contention that Ms. Dohrenwend's conduct was illegal on the ground that it was motivated by prejudice[3] against her because she is Jewish.
On a morning toward the end of the first year of Ms. Blume's employment, she was standing in the outer room of Mr. Deamer's office, greeting teachers as they signed in. Mr. Deamer's secretary, Arlene McGregor, had her desk there. Ms. Blume noticed an attractive pocketbook on Ms. McGregor's desk and complimented her about it. Ms. McGregor responded, "[O]h, this thing; I was able to jew down the price to almost nothing." Ms. Blume took her aside and told her, "I'm glad that you ... got a nice price for the pocketbook, but I just don't think it's appropriate that you use that particular term, especially speaking to me."
Ms. Blume testified that, later, "[M]y secretary came to speak to me in my office and said that she felt so embarrassed for me and how could she say that in public." Ms. Blume told Mr. Deamer about the incident because Ms. McGregor was his secretary. He said, "[O]h, you know, we just don't permit things like that to be said here, and it's a shame that that was said to you." Ms. Blume also told Ms. Dohrenwend about the incident. According to Ms. Blume, Ms. Dohrenwend "echoed what Mr. Deamer said. But to my knowledge no one ever spoke to Mrs. McGregor" and "Mrs. McGregor never apologized to me" for her remark. Jim Clayton had been designated as the school district's Affirmative Action Officer. Ms. Blume told him about Ms. McGregor's remark, and she also told him not to do anything about it.
However, Ms. Blume also testified, "I had a very cordial relationship with Mrs. *1033 McGregor.... [W]e got along very well, and she was very helpful to me and my secretary when I returned from my surgery. I had coffee at her house. I met her outside of school once, so it's been a very nice relationship."
In January or February and again in March or April of Ms. Blume's first year, Ms. Dohrenwend told Ms. Blume that she needed "to be more sensitive to the culture of Denville.... That the way I wear my hair and the jewelry that I wear and the way that I speak might be acceptable among my friends and my family, but they may not be acceptable" in Denville. During cross-examination, Ms. Blume testified that Ms. Dohrenwend commented to her that "the way that I speak, or the way that I dress, the jewelry that I wear doesn't fit into the Denville culture."
Ms. Blume also testified that "kids" would write "Dot Heads" on Asian Indians' lockers. Mr. Deamer would have the custodian wash off the writing, but no other action was taken. Middle school students drew swastikas on the side of the school building. The Denville Chief of Police did not report the incident to the Bias Acts Crime Section of the District Attorney's Office. "He just dismissed the whole thing as being graffiti." Ms. Blume reported these incidents to the Affirmative Action Officer.
Ms. McGregor's insulting remark probably evidenced prejudice on her part. But the incident does not provide a rational basis for attributing prejudice to Ms. Dohrenwend. Ms. Blume asserts that Ms. Dohrenwend's reference to the "culture" of Denville, with the implication that Ms. Blume belonged to a different culture, was a reference to anti-semitic stereotypes. But that interpretation has no basis except pure speculation. There is no evidence from which a jury could rationally infer that Ms. Dohrenwend was not making a possibly valid point that customary styles of dress and language in Denville differed from those prevalent in more metropolitan areas. The record also lacks any basis on which the jury could determine whether or not Principal Deamer or the district's Affirmative Action Officer or the Denville Chief of Police should have responded more forcefully to racist graffiti on lockers and building walls. For example, Ms. Blume does not tell us whether the conduct to which she was referring occurred frequently or only in an isolated instance. The lack of strong remedial action does not tend to show that Ms. Dohrenwend was prejudiced against Jews or, as Ms. Blume's reply brief frames the accusation, against anyone whose "Jewish identity [is] too obtrusive." Consequently, we conclude that, considering the record as a whole, including the untruthfulness of Ms. Dohrenwend's testimony, there is a total absence of evidence that her conduct was motivated by anti-Jewish sentiments.
The following are the events which Ms. Blume cites as evidence that Ms. Dohrenwend was prejudiced against her because she was suffering from cancer.
When Ms. Blume learned in the early fall of 1993, her second school year, that she would have to undergo a second mastectomy, she told Ms. Dohrenwend so that they could discuss prioritizing projects for which Ms. Blume was responsible. Ms. Dohrenwend was "taken [a]back." In the course of their conversation about when the operation would be scheduled, Ms. Dohrenwend said, "[W]hy don't you have it done during Christmas byactually she said byby a Jewish or Indian doctor because they don't celebrate Christmas."
Plaintiff asserts that "defendant Dohrenwend's demeanor dramatically changed toward her after Ms. Dohrenwend learned [that Ms. Blume would have to undergo] a mastectomy." Ms. Blume testified on this point as follows:
Q. From your perspective did Mrs. Dohrenwend'sdid you sense a change in her demeanor towards you after you told her about the cancer?
A. A tremendous change. ItI had really admired her a great deal when I *1034 first started working there, that she was taking on a school district that had a reputation in the past for being pretty stagnant. The [previous] superintendent had been there for over 30 years. And she was making changes. And hiring me was really a testimony that she really wanted a lot of changes made, because I was bringing all these changes with me. And I really trusted her a great deal with mymy future, because this was my first opportunity as an administrator. And then from time to time I would share with her some personal things that hadregarding my health or my children or whatever. But her reaction to mymy needs when I had told her that there was this recurrence inwith cancer, was devastating to me, because there was a betrayal of a trust that I had shown in her. And it was a contradiction to anything else that I had experienced prior to this, that Montclair didn't treat me this way. Everybody came and provided safety nets for me. And here I felt it was as though the rug was being slipped out from underneath me at every moment that I interacted with her.
Ms. Blume was responsible for formulating a "technology plan" by January 17, 1994. On November 4, 1993, she told Ms. Dohrenwend that she had just learned that her mastectomy was scheduled for November 29, 1993. Ms. Blume asked Ms. Dohrenwend, "[W]hat does this do to the time line[?]" Ms. Blume testified as follows about the ensuing conversation:
She says ["]I want everything done by mid[-] November.["] So I said ["]that doesn't give me very much time. You were giving me like three months to do it; now you want it all done before I go into the hospital. ["] [Ms. Dohrenwend said,] ["]Well, this is very important. It's part of the bond issue; we have to have this all in place; I want it done by mid [-]November.["]
Ms. Blume was asked to attend a meeting of a committee of the Board of Education to discuss curriculum on the day that she was scheduled to enter the hospital for cancer surgery. The surgery actually took place the next day. She reminded Ms. Dohrenwend that she was scheduled to enter the hospital, but Ms. Dohrenwend said that that was the only time that she and the Board members could meet. Ms. Dohrenwend said that the meeting would begin at 8:30 a.m. She promised that Ms. Blume's report on curriculum would be the first item of business and, when it was finished, Ms. Blume could excuse herself and leave. But when Ms. Dohrenwend passed out the agenda, Ms. Blume saw that the first item was personnel, not curriculum. She was angry that Ms. Dohrenwend had broken her promise. The committee meeting recessed at 10 a.m. Ms. Blume remonstrated with Ms. Dohrenwend, and Ms. Dohrenwend said that Ms. Blume could present her report as soon as the committee reconvened. But Ms. Blume said that she would be able only to hand her written report to the Board members because she had to meet her husband at 11 a.m. to drive to the hospital in New York.
Ms. Blume was in the hospital for five days and she remained at home for another four days after she left the hospital. Then, for the first week after she had returned to work, she worked on what was supposed to be a half-time basis. She had been told not to drive a car because of the danger that a plate in her chest would cause serious internal injuries in the event of an automobile accident. However, to "allow [her]self the possibility that if road conditions permitted it, [she] could drive" without subjecting herself to the heaviest traffic, she asked to have her half-days run from 9 a.m. to 1 p.m., rather than from 8 a.m. to 12 noon, the standard half-day. Ms. Dohrenwend told her that if she was going to work half-days, she had to work from 8 a.m. to 12 noon.
Ms. Blume's brief states, "The jury could have also inferred from the evidence presented that Mrs. Blume's cancer *1035 required others to assist her on various projects, and that the Superintendent perceived Mrs. Blume's cancer as an impediment to her ability to energize that longstagnant Middle School." The portion of the record cited for this proposition states only that Ms. Blume's work was parceled out to the other administrators as the time for her operation approached because the work had to be accomplished. Nonetheless, on the basis of all of the evidence in the case, the jury could reasonably have drawn the inference which plaintiff imputes to them.
Each of these instances of conduct on the part of Ms. Dohrenwend is susceptible of an entirely innocent explanation. But the issue for us to decide is not whether the evidence is consistent with defendants' contention that considerations other than handicap bias motivated Ms. Dohrenwend's last two negative evaluations of Ms. Blume and her "qualified" recommendation to the Board of Education. The critical issue before us is whether a rational fact-finder could reasonably conclude that Ms. Dohrenwend's change of heart, manifested in those last two memoranda and in her "qualified" recommendation to the Board of Education, was motivated to a substantial degree by a hostile reaction to Ms. Blume because of the recurrence of her cancer.
The jury could reasonably have found that Ms. Dohrenwend's perception that Ms. Blume's "interpersonal skills" were inadequate reflected primarily Ms. Dohrenwend's dissatisfaction with their relationship. The record indicates a number of possible reasons for their bad "chemical reaction" including their differences in style, Ms. Dohrenwend's hostility to a potential rival when Ms. Blume sought her help to obtain a chief administrator's certificate, and Ms. Blume's reluctance to conduct herself with the deference Ms. Dohrenwend thought appropriate to their respective positions. Furthermore, Ms. Dohrenwend hired Ms. Blume to make changes. It is axiomatic that we are all in favor of progress, but we resent change. At least some of the teaching and administrative staff of the district undoubtedly resented the innovations Ms. Blume was introducing. Part of Ms. Dohrenwend's motivation may have been to deflect their resentment from herself. Nonetheless, plaintiff is entitled to her verdict if the jury could reasonably have found that Ms. Dohrenwend's anger or resentment toward Ms. Blume because of the recurrence of her cancer was a substantial or a determinative factor in the Superintendent's change of heart. See Rendine v. Pantzer, 276 N.J.Super. 398, 432, 648 A.2d 223 (App.Div.1994), aff'd as modified, 141 N.J. 292, 661 A.2d 1202 (1995); Slohoda v. United Parcel Serv., Inc., 193 N.J.Super. 586, 590, 475 A.2d 618 (App.Div.1984); Harvard v. Bushberg Bros., Inc., 137 N.J.Super. 537, 540, 350 A.2d 65 (App.Div.1975), certif. granted, 71 N.J. 493, 366 A.2d 649 (1976); cf. Muench v. Township of Haddon, 255 N.J.Super. 288, 296, 605 A.2d 242 (App.Div.1992) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir.1990)).
We reiterate our previously stated conclusion that the record amply supports a finding that the reasons offered by defendants for not renewing Ms. Blume's contract were spurious. In addition, the evidence, which includes the "mendacity" that the jury could reasonably have attributed to Ms. Dohrenwend, supports the inference that she was biased against Ms. Blume because of Ms. Blume's recurrence of cancer. Ms. Blume testified to Ms. Dohrenwend's strong reaction (she was "taken [a]back") to the news that a mastectomy operation would put Ms. Blume out of action for a period of probably brief duration. Ms. Dohrenwend's "demeanor" toward Ms. Blume changed after the disclosure. Her comment, according to testimony which the jury was entitled to credit, that Ms. Blume should schedule her operation to be performed by a Jewish or Indian doctor on Christmas day, could not have been intended as a realistic suggestion. *1036 The message it conveys is of Ms. Dohrenwend's extreme frustration and resentment. Her unwillingness to accede to Ms. Blume's request to present her curriculum report to the committee of the Board of Education before it discussed personnel can be interpreted as evidencing Ms. Dohrenwend's sudden animosity to Ms. Blume. Ms. Dohrenwend's refusal to accommodate Ms. Blume's request for a half-day work schedule that she thought would be more convenient than the standard halfday schedule is evidence that that animosity was not allayed by Ms. Blume's return to work after only nine days. On the basis of these facts considered in the context of the entire record, the jury could reasonably have found that Ms. Dohrenwend reacted with resentment, anger, and hostility to the recurrence of Ms. Blume's cancer and her need to undergo a second mastectomy; that these feelings were not rationally related to Ms. Blume's performance, either before or after she entered the hospital; and that Ms. Dohrenwend's negative evaluations of Ms. Blume in February and April 1994 led the Board of Education to vote against renewing her contract.
The New Jersey Law Against Discrimination prohibits discrimination against a "[h]andicapped" persons by reason of his or her handicap. N.J.S.A. 10:5-4, -4.1, -12, and -29.1. N.J.S.A. 10:5-5(q) defines "[h]andicapped" to include someone "suffering from physical disability, infirmity, malformation or disfigurement which is caused by ... illness ... and which shall include ... any degree of ... amputation...." Ms. Blume is "[h]andicapped" within that definition as the result of the two mastectomies which she underwent as treatment for cancer. Consequently, the evidence that Ms. Dohrenwend's negative evaluations were a reaction to Ms. Blume's cancer and that Ms. Dohrenwend's "qualified" recommendation produced the Board of Education's vote against extending Ms. Blume's contract are sufficient to sustain the verdict in her favor. That evidence could reasonably be found to show that Ms. Dohrenwend discriminated against Ms. Blume in violation of N.J.S.A. 10:5-4, -4.1, -12, and -29.1 because of her handicap. See Cinelli v. U.S. Energy Partners, 77 F.Supp.2d 566 (D.N.J.1999) (dismissal of employee because he was believed to be disabled as a result of his suffering from non-Hodgkins Lymphoma, an incurable form of cancer, violates New Jersey's Law Against Discrimination). A verdict must stand if the evidence adequately supports any one of the alternate theories on which the case was submitted to the jury. Lamendola v. Mizell, 115 N.J.Super. 514, 527, 280 A.2d 241 (Law Div.1971); see also Sons of Thunder, Inc. v. Borden, Inc., 285 N.J.Super. 27, 77, 666 A.2d 549 (App.Div.1995) (Humphreys, J.A.D., dissenting), rev'd, 148 N.J. 396, 690 A.2d 575 (1997). The trial court's entry of a judgment for defendants was therefore error.
However, the trial court properly dismissed Ms. Blume's claim that the Board of Education terminated her employment in retaliation for her complaining to the Board of Education about Ms. Dohrenwend's alleged anti-semitism. That claim is entirely without evidence to support it.
It is unnecessary for us to decide whether a supplementary order declaring defendants entitled to a new trial could properly be entered after plaintiff had filed her notice of appeal. We conclude that, regardless of any procedural issue, the verdict cannot be set aside on the ground that it is against the weight of the evidence because the proofs adequately support the jury's finding that defendants discriminated against Ms. Blume because of her handicap. See Carrino v. Novotny, 78 N.J. 355, 360-61, 396 A.2d 561 (1979); Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98, 379 A.2d 225 (1977).
The trial court's refusal to submit the issue of punitive damages to the jury was correct because the defendants' conduct, although unlawful, was not especially egregious. See Mogull, supra, 162 N.J. at 473, 744 A.2d 1186; Baker v. National *1037 State Bank, 161 N.J. 220, 223, 736 A.2d 462 (1999); Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 113, 735 A.2d 548 (1999).
Because the trial court entered judgment for defendants, it did not rule on plaintiff's requests for interest, attorneys' fees and costs. They should now be considered by the trial court in the light of this opinion.
The judgment appealed from is reversed and this matter is remanded to the trial court to consider plaintiff's application for interest, attorneys' fees and costs, to reinstate the jury verdict and to enter judgment in conformity with this opinion.
NOTES
[1] In Fleming, supra, 164 N.J. at 101, 751 A.2d 1035, this excerpt from St. Mary's Honor Center, supra, 509 U.S. at 511, 113 S.Ct. at 2749, 125 L.Ed.2d at 418, reads "intentional [retaliation]" because Fleming, supra, is a "retaliation" case. But the opinion in St. Mary's Honor Center, supra, itself, from which the quote is taken, reads "intentional discrimination."
[2] Here too Fleming, supra, refers to intentional' retaliatory action." The language in St. Mary's Honor Center, supra, is "intentional discrimination."
[3] Plaintiff's reply brief somewhat modifies her claim that Ms. Dohrenwend caused the Denville Board of Education to terminate her employment because she is Jewish. Ms. Blume says in her reply brief,

With regard to defendants' contention that Ms. Dohrenwend could not have discriminated against Mrs. Blume on the basis of her religion because Ms. Dohrenwend says she became aware of Mrs. Blume's religion shortly after she was hired, plaintiff's contention was not necessarily that Mrs. Blume was fired because of her religion per se, but rather that she was fired for making her Jewish identity too obtrusive for Ms. Dohrenwend's liking.