883 A.2d 387 (2005)
380 N.J. Super. 511
Marie DeWEES, Plaintiff-Appellant, and
Pamela Pernot,[1] Plaintiff,
v.
RCN CORPORATION, David McCourt, Michael Mahoney, and Kenneth Knudsen, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 19, 2005.
Decided July 15, 2005.
*389 Jon W. Green, Morristown, argued the cause for appellant (Green Lucas Savits & Marose, attorneys; Mr. Green and Glen D. Savits, of counsel and on the brief).
Cynthia M. Jacob, Somerset, argued the cause for respondents (Collier, Jacob & Mills, attorneys; Ms. Jacob, of counsel and on the brief; Franco Mazzei, on the brief).
Before Judges KESTIN, ALLEY and FUENTES.
The opinion of the court was delivered by
FUENTES, J.A.D.
Plaintiff Marie DeWees appeals from the dismissal of her cause of action alleging gender and age discrimination in violation of our State's Law Against Discrimination. N.J.S.A. N.J.S.A. 10:5-12(a). The Law Division granted defendants' summary judgment motion, concluding that plaintiff had not produced sufficient evidence to show that defendants' proffered business reasons for her termination (poor performance and a personality conflict with her superior) were pretextual.
In this appeal, plaintiff argues that the motion judge erred when he applied an incorrect standard on summary judgment, weighing the evidence rather than giving her the benefit of the proffered evidence and its reasonable inferences. After reviewing the record and considering the applicable law, we agree with plaintiff and reverse.

I
Plaintiff was fifty years old at the time she was terminated from her position as RCN's senior vice president of customer service in 1998, after approximately eight years of service. She was the top-ranking woman in the company at the time of her termination.
Defendant Michael Mahoney was, at all times relevant to the issues raised here, president of RCN Corporation, a provider of cable and long-distance telephone service. Defendant David McCourt was RCN's Chief Executive Officer. Kenneth Knudsen, another RCN executive, was originally named as a defendant. Plaintiff did not pursue her claims against him.
*390 Plaintiff started working for C-Tec, RCN's predecessor, in May 1990 as manager of marketing and ad sales, earning $42,055 per year. After several promotions and salary increases, she became director of development in February 1995, earning $77,500; vice president of marketing in August 1995, earning $97,500; and senior vice president of customer sales in February 1997, earning $125,000. She was the only woman vice president in the company.

A

Evidence of Pattern of Discriminatory Treatment
In 1996, plaintiff complained that her salary was lower than it should have been in 1995 and 1996. In response, she was told that she would be "taken care of" at bonus time. Although she received a substantial bonus in 1996, she claimed that it was completely due to her work in a "special project," and thus unrelated to any attempt at income parity. RCN president Mark Haverkate, her supervisor until 1995, noted that in 1996 her salary was the lowest in her "band."
According to plaintiff, McCourt told her that Mahoney wanted to reduce the extraordinary bonus that she received in 1996 for her work on a special project, but did not want to reduce similar bonuses received by two male executives. In his deposition, Mahoney denied having any problems with plaintiff's 1996 bonus.
Plaintiff testified that McCourt commented, upon introducing her to someone, that she had "balls." She took this vulgarity to mean that she was tough. She further indicated that other people had used this term to describe her before, but she was "a little shocked" and "taken aback" that the CEO would introduce her this way. According to plaintiff, this remark was indicative of a male-centric "atmosphere," where "[y]ou had to be one of the guys to make it at RCN. And I was not."
Plaintiff described Mahoney's attitude toward women as "[e]litist" and "dismissive." She characterized Mahoney's demeanor as "bothered" by her "challenges" to some of the things that he did. He also would ignore her at meetings and "looked through you like you weren't there."
Plaintiff described an incident in which she met Mahoney on the stairs and asked him how he was; he answered that he was "really stressed." When she asked, "Is there anything I can do to help," Mahoney replied, "I guess you can just quit." In a subsequent deposition, plaintiff changed this testimony to indicate that Mahoney said that "he guessed that he could always quit." She added, however, that she took this comment as "an innuendo to mean that I could quit. He had no intention of quitting." Plaintiff explained that she interpreted Mahoney's remark this way because "[t]hey were making my job really difficult," and there were rumors that her superiors were trying to force her to resign.
In late 1996, plaintiff testified that she was talking with Lorraine Reddington (RCN's controller), when Mahoney "snickered" and said: "Well, imagine the two of you talking about technical issues." According to plaintiff, this remark revealed Mahoney's sexist attitudes toward women, in that "technical issues" are beyond the understanding of women.
When Mahoney became president of RCN in June or July of 1997, McCourt decided to remove both plaintiff and Haverkate from marketing and sales. He made this decision because "subscriber gains, access lines gains and numbers that were being achieved were not in line with the plan and were not in line with the *391 growth rate that he had expected from them." Mahoney testified that he did not want plaintiff to remain in operations because her experience was in marketing and sales, and "we had a tremendous problem at RCN with provisioning customers, getting customers that had signed up for sales on to her network as billable customers." McCourt directed Mahoney to take over operations, and agreed with Mahoney's suggestion to hire someone new to assist.
McCourt accepted Mahoney's suggestion to move plaintiff to customer service. Mahoney explained that "customer service was a problem big enough that McCourt was getting multiple letters a day complaining." Mahoney removed John Gdovin, who was thirty-five years old, from customer service in October 1997, but Gdovin "kept the programming responsibilities that he always had and also assumed responsibility for Cable Michigan," a part of C-Tec. According to Haverkate, McCourt chose plaintiff as "the best person in the company" to manage customer service. She had taken over management of the New York office and turned it around "from horrible to pretty good."
Haverkate described McCourt's management style as involving "a lot of mix-up and changes going on all the time." He said that McCourt
managed the company almost like a soccer team, and he ... expected that people would play whatever roles or positions that he thought was the best lineup at any given period of time.
And ... he had a tendency to elevate people to a higher status than maybe they deserved at the time.... And then time would go by and ... they would make a mistake or they fumbled the ball... and they would go, boom, right down to the bottom and would be ... in the doghouse.
But that happened to everybody. It was a continual thing and people adapted to it.... But the reality was that you had to play on the team ....
* * * *
When people were in the doghouse they didn't get too depressed about it because you work hard and times will change and they'll get back out.
Plaintiff testified that McCourt told her that "customer service was all fucked up, and that because I had an operations, marketing and sales background and no one else in the company did, that I could straighten it out." She explained that she had a "crown jewel job," which she loved, and McCourt asked her to accept a "job in the black hole" with accountability but no authority. Thus, she believed that she was "set up to fail."
Plaintiff initially declined the customer service offer. She accepted in June or July 1997, after Knudsen assumed her marketing responsibilities. In August 1997, Mahoney hired forty-two-year-old Scott Jarus, who assumed plaintiff's other responsibilities. Plaintiff reported directly to Jarus.
Plaintiff described Jarus as sarcastic and belittling. She believed he was carrying out Mahoney's orders "[b]ecause no one could be that nasty and enjoy it." According to plaintiff, although Jarus was condescending toward men, he was worse with women.
Under Jarus, plaintiff claims to have been unable to obtain "the tools and resources" needed to adequately perform her customer service responsibilities. Mahoney corroborated, in part, plaintiff's claims in this respect. He admitted that plaintiff did not have the authority to increase staff and meet her department's infrastructure needs. Jarus denied a number of proposals *392 made by plaintiff, including a plan to develop an incentive plan.
She testified that Jarus would assign projects directly to people who reported to her, without informing her, and then hold her accountable for their outcome. At least on one occasion, Jarus directed plaintiff's secretary to look for her when she was not at her desk, including following plaintiff into the restroom. Jarus would ostensibly forget that plaintiff had informed him when she would be out of the office, and failed to include her or invite her to meetings.
Plaintiff testified that Mahoney asked her to agree that customer service should report to him. When she responded that she needed to think about it, Mahoney falsely told McCourt that plaintiff had agreed. As to plaintiff's performance, Mahoney acknowledged that she opened a customer service center in Princeton as directed, and characterized her efforts in this respect as adequate. He disagreed, however, with her approach to the customer service problem, which was to increase the size of the staff. He admitted that he did not have "enough time" to ascertain what was wrong with customer service before he left in March 1998.

B

The Termination
In October 1997, C-Tec divided into three separate companies: RCN, Cable Michigan, and CTCo (Commonwealth Telephone Company). McCourt remained as chair of all three companies. RCN became plaintiff's employer. According to plaintiff, her reviews during her tenure at C-Tec/RCN were "superior or exceptional." When she began reporting to Mahoney four months later, "I went from being a superior employee to getting terminated." Haverkate, who supervised plaintiff until she became senior vice president of customer sales in February 1997, corroborated that her performance was excellent.
According to Mahoney, in September and October 1997, Jarus expressed concern about plaintiff's lack of cooperation and communication. In December 1997, Jarus told Mahoney that he could no longer work with plaintiff. Mahoney said that he approached several senior executives  Haverkate, Knudsen, Gdovin, Mike Adams, and Dhiraj G. Gulati  to find another position for plaintiff in the company. None were interested. He thus decided to terminate plaintiff. McCourt told him: "That's your decision."
Gulati and Adams both denied that Mahoney asked them about a position for plaintiff in their departments. According to Haverkate, there were other positions that plaintiff could have taken, because the company was growing fast and had "a history of musical chairs and people taking different roles." According to Haverkate, since plaintiff's termination, "lots of people have come and gone at the senior level positions." When Haverkate attempted to talk to Mahoney, he refused to see him. McCourt also declined to talk to Haverkate about plaintiff's termination.
Mahoney terminated plaintiff on January 13, 1998. His reasons for doing so were twofold: "her deteriorating work performance, coupled with her personality conflict with her supervisor, Scott Jarus, and other RCN employees." According to Mahoney, Jarus assumed her duties as head of customer service. Mahoney left operations in March 1998. Defendants hired Jeanne Daniels, a fifty-four-year-old woman, in June 1998 to replace plaintiff.

C

Stock Option Plan as a Part of Damages
According to Jonathan Paules, RCN's manager of executive compensation and *393 stock options, plaintiff received 10,000 shares of C-Tec stock under the 1994 stock option plan. Two thousand of these shares vested on January 3, 1996. Another 2,000 shares vested on January 3, 1997, and another 2,000 on January 3, 1998, before plaintiff's termination on January 13.
According to plaintiff, Mahoney intentionally delayed her receipt of her 1994 stock options. Haverkate told her that Mahoney, who had to approve her options, wanted to decrease the number of her options, and increase her "strike price." According to plaintiff, Gulati was granted options on the same day, and Mahoney did not want to increase his "strike price."
Paules testified that plaintiff received 20,000 shares of C-Tec stock under the 1996 stock option plan. Because none of the shares had vested at the time of her termination on January 13, 1998, they were cancelled. Plaintiff asserted that her "first round of options" from 1996 would have vested thirty days after her termination.
Mahoney admitted that when he terminated plaintiff in January 1998, he was aware that she had options that were about to vest, but he did not consider keeping her on the payroll until that time because "there was never a policy or a situation in the company where we did that for anyone." Despite Mahoney's explanations, Haverkate characterized the timing of plaintiff's termination (a month before her options would have vested) as "punitive." Haverkate was also aware of employees who, although terminated, had been allowed to stay on the payroll until their options vested.

II
We will begin our analysis by reaffirming basic principles of appellate review. We review a summary judgment order by employing the same standard that governs trial courts. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div.1998). Because our review involves a purely legal analysis, we are not obligated to defer to the trial court's legal conclusions. Illva Saronno Corp. v. Liberty Hill Realty, Inc., 344 N.J.Super. 443, 450, 782 A.2d 473 (App.Div.2001).
Summary judgment is appropriate if "there is no genuine issue as to any material fact challenged and ... the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Without assessing credibility, weighing the evidence, or determining its truth, the motion judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Under N.J.S.A. 10:5-12a, it is an unlawful employment practice "[f]or an employer, because of the ... age ... [or] sex ... of any individual ... to discharge ... from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." We note that the motion judge correctly acknowledged McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as the case controlling the evaluation of defendant's motion.
Where there is no direct evidence of discrimination, the plaintiff-employee must first establish a prima facie case by showing that: (1) she was in a protected class; (2) she was performing her job at a level that met the employer's legitimate *394 expectations; (3) she was nevertheless discharged; and (4) the employer sought someone else to perform the same work after she left. Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, 462, 744 A.2d 1186 (2000). Here, the court determined that plaintiff established each prong of her prima facie case: she was a member of a protected class (female and age fifty); she was performing her job in a satisfactory manner; she was discharged; and someone replaced her.
Establishment of the prima facie case creates a presumption of discrimination. The burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for plaintiff's discharge. Ibid.; Bergen Commercial Bank v. Sisler, 157 N.J. 188, 210, 723 A.2d 944 (1999). Here, the motion judge determined that defendants articulated two such nondiscriminatory reasons: (1) plaintiff's alleged unsatisfactory performance in customer relations; and (2) her personality conflict with Jarus.
Once the employer produces evidence of a legitimate reason for the discharge, the presumption of discrimination disappears, and the burden shifts back to plaintiff to prove that the employer's reasons were a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2751-52, 125 L. Ed.2d 407, 422 (1993); Mogull, supra, 162 N.J. at 462, 744 A.2d 1186; Sisler, supra, 157 N.J. at 210-11, 723 A.2d 944. The ultimate burden of proof always remains with the plaintiff. St. Mary's, supra, 509 U.S. at 518, 113 S.Ct. at 2753, 125 L.Ed.2d at 423; Sisler, supra, 157 N.J. at 211, 723 A.2d 944.

III
Defendants contend that the judge erred in determining that plaintiff established her prima facie case, and that this is an alternative ground for affirming the summary judgment. According to defendants, plaintiff did not prove the second and fourth prongs of the prima facie case, because her job performance was not satisfactory and defendants replaced her with another, older woman.
We reject defendants' argument. "The burden of establishing a prima facie case of disparate treatment is not onerous"; the function of the prima facie case is to eliminate "the most common nondiscriminatory reasons for the plaintiff's rejection." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 215-16 (1981). We agree with the motion judge that the record, considered in the light most favorable to plaintiff, shows that she was performing her job at a level that met her employer's reasonable expectations.
When considering a plaintiff's job performance for the purpose of her prima facie case, the standard is whether she was "objectively qualified" for the position. Pilkington v. Bally's Park Place, 180 N.J. 262, 850 A.2d 1225 (2004); Baker v. Nat'l State Bank, 312 N.J.Super. 268, 285, 711 A.2d 917 (App.Div.1998), aff'd and remanded, 161 N.J. 220, 736 A.2d 462 (1999); Greenberg v. Camden Cty. Vocational & Tech. Schs., 310 N.J.Super. 189, 203, 708 A.2d 460 (App.Div.1998). Here, plaintiff was employed by RCN and its predecessor, C-Tec, for approximately eight years, although not in the customer service position from which she was terminated. Nevertheless, plaintiff had been vice president of marketing for eighteen months before she was promoted to senior vice president of customer service. According to Haverkate, who supervised plaintiff until her promotion to vice president, her performance was excellent. Mahoney acknowledged that plaintiff's performance *395 was satisfactory during her first few months in customer service. This was sufficient proof that plaintiff was objectively qualified for her job.

IV
Defendants also contend that plaintiff failed to satisfy the fourth prong of the prima facie case, that defendants sought someone else to perform the same work after she left. Mogull, supra, 162 N.J. at 462, 744 A.2d 1186. In support of this argument, defendants complain that the judge did not consider a supplemental certification submitted by Paules, their manager of executive compensation and stock options, which, according to defendants, "contained information regarding Ms. Daniels."
Paules's certification did not pertain to Daniels. It merely listed 323 employees who were terminated or resigned from RCN from October 1997 through December 1999, and who lost their unvested stock options at the time of their termination. Moreover, the motion judge correctly determined that Daniels's status as a member of both of plaintiff's protected classes (age and gender) was not probative because Mahoney, who terminated plaintiff, did not hire Daniels.
Unless a plaintiff is claiming reverse discrimination, it is unnecessary to show a replacement outside of the protected class in order to satisfy the fourth prong of the prima facie case. Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 353 (3d Cir.1999) (a woman claiming that she was discharged because of her gender need not show that she was replaced by a man); Wright v. L-3 Communications Corp., 227 F.Supp.2d 293, 301 (D.N.J.2002) ("the fourth McDonnell Douglas element is satisfied in traditional cases if the employer sought others to perform the same work that the plaintiff performed after the plaintiff was terminated"); Petrusky v. Maxfli Dunlop Sports Corp., 342 N.J.Super. 77, 82, 775 A.2d 723 (App.Div.), certif. denied, 170 N.J. 388, 788 A.2d 772 (2001) ("it is erroneous, in an ordinary case of age discrimination in employment, to use reference to a particular replacement employee as the only means for satisfying the customary fourth element of the prima facie showing"); Reynolds v. Palnut Co., 330 N.J.Super. 162, 168, 748 A.2d 1216 (App. Div.2000) (a plaintiff asserting a traditional age discrimination claim need not show that he was replaced by someone younger). But see Swider v. Ha-Lo Indus., Inc., 134 F.Supp.2d 607, 625 (D.N.J.2001) ("in order to satisfy the fourth prong of the McDonnell Douglas prima facie case, plaintiff must show that he was replaced by someone sufficiently younger to create an inference of unlawful age discrimination"); Warner v. Fed. Express Corp., 174 F.Supp.2d 215, 220-21 (D.N.J.2001) (applying this standard to a LAD age discrimination case).

V
The factfinder is, of course, free to reject defendants' nondiscriminatory reasons for the discharge, and infer the ultimate fact of intentional discrimination from all of the evidence presented in a case. St. Mary's, supra, 509 U.S. at 511, 113 S.Ct. at 2749, 125 L.Ed.2d at 418. "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." Ibid.
Plaintiff's prima facie case, together with rejection of the defendants' reasons, "does not compel judgment for the plaintiff." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 146, 120 S.Ct. 2097, *396 2108, 147 L. Ed.2d 105, 119 (2000). We have adopted the analysis in Reeves. See Blume v. Denville Tp. Bd. of Educ., 334 N.J.Super. 13, 29-34, 756 A.2d 1019 (App. Div.2000) (reinstating jury verdict in plaintiff's favor and vacating trial court's grant of defendant's motion to set aside verdicts because plaintiff's evidence supported a finding of discrimination on the basis of a handicap); Mattiello v. Grand Union Co., 333 N.J.Super. 12, 17, 754 A.2d 563 (App.Div.), certif. denied, 165 N.J. 677, 762 A.2d 658 (2000) (affirming a jury verdict in favor of defendant-employer, because the judge correctly charged the jury that it may, but not must, find in favor of plaintiff, on an age discrimination claim, if it finds that defendant's proffered reason is not believable).
The Court in Reeves explained: "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." 530 U.S. at 147, 120 S.Ct. at 2108, 147 L.Ed.2d at 119-20.
Defendants rely on Viscik v. Fowler Equip. Co., 173 N.J. 1, 14, 800 A.2d 826 (2002), a handicap discrimination case, in which the Supreme Court held that after the employer articulates a legitimate, nondiscriminatory reason for its adverse action,
the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination. To prove pretext, however, a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent .... Thus, under the McDonnell Douglas framework, a plaintiff retains the ultimate burden of persuasion at all times ....
(Internal citations omitted.)
Defendants' reliance on Viscik is misplaced, because the Supreme Court in that case did not address the standard for a motion for summary judgment. In Viscik, defendant appealed after a jury verdict, and the issues were whether plaintiff had established a handicap (obesity) and whether there were errors in the jury charge. Id. at 12, 800 A.2d 826. The Court was emphasizing that the ultimate burden of proof was upon plaintiff and did not consider a plaintiff's burden on a motion for summary judgment.
The Third Circuit, however, has established the standard, on a motion for summary judgment, for determining whether a plaintiff alleging discrimination has produced sufficient evidence to rebut the employer's alleged legitimate reason for its adverse action. Fuentes v. Perskie, 32 F.3d 759, 761-62 (3d Cir.1994). In Fuentes, the court held that a plaintiff may defeat a motion for summary judgment "by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Id. at 764.
As to the first means of proof, the Fuentes court explained:
the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," Ezold [v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir.1992), cert. denied, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993)], and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." Josey *397 v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir.1993).
[Id. at 765 (other citations omitted; footnote omitted.)]
We have adopted and consistently applied this standard. See, e.g., Kolb v. Burns, 320 N.J.Super. 467, 478, 727 A.2d 525 (App.Div.1999) (teacher alleged that superintendent of schools retaliated against her for testifying for a handicapped student regarding his placement); Greenberg, supra, 310 N.J.Super. at 200, 708 A.2d 460 (teacher alleged age and gender discrimination in denial of tenure); and Romano v. Brown & Williamson Tobacco Corp., 284 N.J.Super. 543, 551-52, 665 A.2d 1139 (App.Div.1995) (employee alleged retaliatory discharge for testifying on behalf of a co-employee in her sexual harassment case).
Unfortunately, the motion judge here did not apply this standard. The judge addressed only the second of the two alternative ways in which plaintiff could defeat the motion for summary judgment: by adducing direct or circumstantial evidence that "discrimination was more likely than not a motivating or determinative cause" of plaintiff's discharge. Fuentes, supra, 32 F.3d at 764. He did not consider either that plaintiff might have discredited defendants' proffered reasons, or that a jury is permitted to infer discrimination on the basis of a rejection of defendants' reasons together with plaintiff's prima facie case. Reeves, supra, 530 U.S. at 147, 120 S.Ct. at 2108, 147 L.Ed.2d at 119-20; St. Mary's, supra, 509 U.S. at 511, 113 S.Ct. at 2749, 125 L.Ed.2d at 418.
Although the motion judge articulated the correct standard, he did not actually consider whether plaintiff had produced sufficient evidence to enable a jury to find that defendants' proffered reasons for her termination were false, which might also constitute circumstantial evidence of discrimination. Instead, as plaintiff points out, he focused throughout his opinion on whether each incident or piece of plaintiff's evidence alone could be the basis for an inference of discrimination.
The judge viewed defendants' preferential treatment of young men, reassigning them to other positions instead of discharging them for unsatisfactory performance, as insufficient to constitute "an LAD violation." He failed to recognize, as a jury is entitled to do, that this is also an inconsistency, incoherency or weakness in defendants' explanation that they terminated plaintiff for unsatisfactory performance. Nor did the judge analyze any of the specific instances of this disparate treatment, which must be "viewed in the light most favorable" to plaintiff. Brill, supra, 142 N.J. at 540, 666 A.2d 146.
Thirty-five-year-old Gdovin was plaintiff's predecessor as manager of customer services. Despite his failure in that role, defendants assigned him responsibility for one of the spin-off companies, Cable Michigan, while he continued his duties in programming. Jarus, to whom plaintiff reported, was accountable for the poor condition of customer service, but was retained when plaintiff was discharged. Mahoney, to whom Jarus reported, admitted that he was unable to develop a solution to the customer service problems, but was also retained when plaintiff was discharged.
There are other facts supporting plaintiff's argument, that a rational jury could reject defendants' non-discriminatory reasons for her termination. Mahoney disagreed with plaintiff's approach to the customer service problems, but he was unable to present any alternative approach. Jarus did not permit plaintiff to develop an employee incentive plan, and rejected all of her proposals. Mahoney *398 admitted that plaintiff did not have the authority to increase staff and meet her department's infrastructure needs. All of these explanations, of course, may also be used by a jury to find in favor of defendants. They are not a basis, however, to dismiss plaintiff's case as a matter of law.
The contradiction between Mahoney's testimony that he attempted to find plaintiff another position in the company, and the denials of three of the executives whom Mahoney said he approached further discredit defendants' job-performance explanation. Defendants' counter argument, that the availability of another position in the company is irrelevant, is unavailing, because the absence of another position was not one of their proffered reasons for plaintiff's termination.
The second reason that defendants advanced for plaintiff's termination was her personality conflict with Jarus. In his analysis, the motion judge did not consider plaintiff's contradictory evidence.
Defendants are incorrect that plaintiff admitted a personality clash with Jarus. To the contrary, she said that it was an "oversimplification" that she and Jarus "were not a good fit." She described Jarus as a nasty, belittling, sarcastic, and condescending person, who rejected her proposals, undermined her authority, required her to report her location at all times, and excluded her from meetings. If a jury credits plaintiff's account, it could rationally find that Jarus's behavior was so extreme that it went beyond a personality conflict, and that defendant's explanation was thus unworthy of belief.
A rational jury could find that plaintiff discredited each of defendant's three alleged legitimate, nondiscriminatory reasons for her termination. Brill, supra, 142 N.J. at 540, 666 A.2d 146. The evidence on each of defendants' three proffered reasons was not "so one-sided" that defendants "must prevail as a matter of law." Ibid. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)).
In addition, plaintiff produced some evidence that Mahoney was prejudiced against women and treated men more favorably, which, as defendants stress, was insufficient to advance a claim for a hostile work environment, but which supports her claim that he discriminated against her when he terminated her.
Mahoney "snickered" and commented that plaintiff and another woman were discussing "technical issues." The judge acknowledged that this was "somewhat sexist" but dismissed it as "isolated" and a "passing comment" that occurred well before plaintiff's termination and did not "play a role" in that decision.
In Reeves, an age discrimination case, the Court of Appeals discounted "age-related comments" of one of the decision makers because he did not make the comments in the context of plaintiff's termination. 530 U.S. at 152, 120 S.Ct. at 2111, 147 L.Ed.2d at 123. The Supreme Court admonished that the Court of Appeals "failed to draw all reasonable inferences in favor of petitioner." Ibid.
Here also, the "somewhat sexist" comment, although not directly related to plaintiff's termination, revealed Mahoney's arguable discriminatory animus. According to plaintiff, Mahoney also had an "elitist" and "dismissive" attitude toward women. This comment and attitude, taken together with Mahoney's (1) desire to reduce plaintiff's 1996 bonus, while failing to consider similar action against two male executives; (2) delay of plaintiff's 1994 stock options; and (3) desire to reduce plaintiff's number of options and increase her strike price, while not seeking to change the stock-option terms of male executives, *399 together provide a sufficient record from which a jury could draw a rational inference of discrimination.
Reversed and remanded.
NOTES
[1] Pamela Pernot's complaint, also alleging gender and age discrimination, was severed in March 2002 on defendants' motion. She thereafter settled her case.