**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2857-21

TATIANA UGARTE,

     Plaintiff-Appellant,

v.

BARNABAS HEALTH
MEDICAL GROUP PC,
GIUSEPPE SALESE, M.D.,

     Defendants-Respondents,

and

ANNETTE BURNETT,[1]

     Defendant.

_____

        Submitted November 28, 2023 – Decided February 16, 2024

        Before Judges Gooden Brown and Puglisi.

        On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-3042-19.

---

[1]  The correct spelling of defendant's last name is Burnett, improperly pled as Burnette.

Ionno & Higbee, attorneys for appellant (Sebastian Ben Ionno II, Debra Rebecca Higbee, and David B. Michelson, on the brief).

Apruzzese, McDermott, Mastro & Murphy, PC, attorneys for respondents (Mark J. Blunda, of counsel and on the brief; Neha Patel and Catherine A. Morris, on the brief).

PER CURIAM

Plaintiff Tatiana Ugarte appeals from the Law Division's April 28, 2022 order granting summary judgment in favor of defendants[2] Barnabas Health Medical Group, PC (Barnabas) and Giuseppe Salese, M.D. (collectively, defendants), on her claim of retaliatory discharge under N.J.S.A. 34:19-3(c)(3) of the Conscientious Employees' Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, and dismissing her complaint with prejudice. Having reviewed plaintiff's arguments and the record in light of the applicable standards, we affirm.

I.

Plaintiff was employed as the office supervisor of Barnabas's West Orange medical office from September 3, 2015 to October 5, 2018. In 2014, Barnabas purchased the medical practice, formerly Primary Medical Care (Primary), where Salese was the president and a joint owner. After the acquisition by

---

[2] Plaintiff did not appeal the court's dismissal of defendant Annette Burnett for lack of prosecution.

Barnabas, Salese no longer had unilateral authority to hire and fire employees, which he had as an owner of Primary, and instead was required to obtain a Barnabas regional manager's approval for those employment decisions.

Plaintiff had approximately fourteen years' administrative experience working in medical offices prior to her employment with Barnabas. She reported to Burnett, oversaw the daily operations of the office and supervised eight to nine employees, including Salese's medical assistant, Delmis Macias. Plaintiff conducted monthly meetings with her staff during which she regularly discussed HIPAA[3] compliance issues and violations. Salese also attended plaintiff's staff meetings.

Burnett worked for Salese during the fourteen years preceding Barnabas's acquisition of Primary. During that time, she regularly brought HIPAA compliance issues to Salese. She worked with Salese through Barnabas's acquisition of Primary, until her retirement five years later.

In late summer 2018, plaintiff approached Salese to discuss her concerns regarding two instances of HIPAA violations in the office. She told Salese that

---

[3] HIPAA is an acronym for the Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d to 1320d-9, which in part "concerns the protection of personal medical information and regulates its use and disclosure." N.J. Transit PBA Local 304 v. N.J. Transit Corp., 384 N.J. Super. 512, 516-17 (App. Div. 2006) (citations omitted).

A-2857-21

Macias was taking patient charts home from Barnabas's Belleville office on Fridays to bring them to the West Orange office on Mondays. She also told him that Macias and other employees were taking home documents containing patient information to study as part of their training.[4] According to plaintiff, Salese said he had instructed them to do so, and because it was his office he could do what he wanted. Plaintiff objected and instructed staff at her meetings that they could not take patient information home. She was not aware of any staff member who continued doing so after her instruction.

At some point prior to summer 2018, Salese approached plaintiff about his own concerns regarding HIPAA violations. As a result of their discussion, Barnabas addressed the issue by providing staff with encrypted phones the following week.

The September 26, 2018 incident

Although the parties disputed the details of the September 26, 2018 incident, they agreed on the following facts. Around 8:00 a.m. that day, plaintiff and Macias had a verbal altercation, which began after plaintiff, who was outside

---

[4] Defendants disputed plaintiff's allegations regarding HIPAA violations but assumed their truth for purposes of summary judgment. During his deposition, Salese acknowledged that removing documents containing patient information from the office would violate HIPAA, but denied that he instructed the staff do so or that he discussed the issue with plaintiff.

the building, believed she saw Macias standing near plaintiff's desk. By the time plaintiff entered the room, Macias had already begun walking towards her own desk. The two women then started yelling at each other. Salese heard the argument, came upstairs, and directed an employee to call the police. The police arrived and spoke to plaintiff, Macias, and Salese; there is no indication that officers made an arrest or filed any report about the incident.

Plaintiff was excused from work for the rest of the day and two days later, she was placed on paid leave pending investigation into the incident. Macias continued working at the office.

Later on the day of the altercation, Macias emailed a letter to the human resources department complaining of a "hostile work environment" due to "multiple unfriendly encounters" with plaintiff and being "called '[N*****]' by favored staff" without their being reprimanded. The letter also detailed Macias's account of the altercation. Kelly Holman, Barnabas's human resources contact for the West Orange office, testified that she considered Macias's complaint about the racial slur as a separate incident from the altercation.

At Burnett's request, Sharon McSorley, a Barnabas employee who periodically visited the West Orange office and witnessed the altercation, provided her account in an email. According to McSorley, the incident occurred

when Macias stepped away from the area where she and Macias had been training. The email went on to state:

> At the time she left our work area, [Macias] was quiet and calm. [Plaintiff] had just walked in as [Macias] was heading back to her work station. I heard shouting and heard [plaintiff] saying in a very loud voice "I only asked a question[]." [Macias] shouted back and responded "I didn't look through your desk." This repeated a number of times and their voices were quite loud. Neither [plaintiff] nor [Macias] responded to Dr. Salese's request to stop at which time he directed another employee to call the police. As the manager, [plaintiff] did not attempt to de-escalate the situation.
>
> [(quotation marks altered).]

By the next morning, the email had been forwarded to Barnabas's regional manager, head of human resources, two members of its West Orange operations team, and Salese and Holman.

During her deposition, plaintiff testified that as she walked from her car towards the office building, she saw Macias standing near her desk. After entering the building and wishing Macias and others a "good morning," she said to Macias, "I saw you around my desk area, were you looking for something?" and Macias "immediately" began yelling that plaintiff was accusing her of

A-2857-21

stealing. They went back and forth about whether plaintiff had accused Macias of stealing, although plaintiff claimed she never raised her voice.[5]

By the time Salese and Barbara Stevens, a Barnabas administrative employee, entered the room, plaintiff was sitting at her desk and Macias was walking away. Plaintiff testified the only people who witnessed the altercation were McSorley and another Barnabas employee named Angela.

Salese testified that prior to the September 26 incident, he had observed plaintiff "picking on" Macias during staff meetings. He believed plaintiff instigated the altercation, but acknowledged he did not witness the start of it. Upon hearing shouting, Salese went upstairs, where the argument was already underway. He saw plaintiff scream at Macias, then Macias scream back and walk towards her own workstation. He told them to stop three or four times, but neither heeded him. He saw both women "almost coming towards each other" and, fearing "an act of violence" was about to take place, instructed another employee to call the police. He believed plaintiff, by virtue of her supervisory role, was responsible for failing to de-escalate the situation.

---

[5] Macias admitted she raised her voice at some point, but maintained plaintiff began yelling first, upon entering the building. She also testified the altercation was still ongoing when Salese entered the room and plaintiff continued yelling despite his requests to stop.

A-2857-21

Salese asked Macias about the incident but did not speak to plaintiff about it because she never returned to work. At some point after his conversation with Macias, Salese met with Holman and two members of the operations team to relay his account. The meeting lasted about ten minutes, during which Salese said he wanted Barnabas to transfer plaintiff out of the West Orange office but did not want her terminated.

Salese did not know who fired plaintiff. He maintained she caused her own termination because she behaved unprofessionally as the supervisor, explaining "the manager puts the fires out instead of making it into an erupting volcano." Salese was notified of plaintiff's termination on October 5, 2018, by email from a member of the operations team.

During Burnet's deposition, she testified plaintiff and Macias had an adversarial relationship for which she blamed plaintiff, because Macias was "very quiet, nonconfrontational," and plaintiff was "the opposite."

Investigation and termination

Holman investigated the September 26 incident. She spoke with plaintiff, Macias, Stevens, McSorley, Salese and "one or two other employees" whose names she did not remember; she also met in person with Salese to hear his account. Salese told her that other than hearing a lot of yelling coming from

A-2857-21

upstairs, he had not witnessed the argument. Salese did not tell Holman he wanted plaintiff terminated, but she could not recall if Salese said he wanted plaintiff transferred.

Holman described the decision to terminate plaintiff's employment as a "collective decision" made by herself, two other human resources personnel and three members of the operations team. They decided to fire plaintiff because the statements from Stevens, McSorley, and "one or two other employees" "more closely[] validated" Macias's version of the altercation than plaintiff's, particularly about "the way that [plaintiff] entered the office and did not appropriately de[-]escalate the situation," and that she "was not as calm" as Macias. Holman said the decision was not based on Salese's account because he did not witness the incident, and he did not participate in the decision to terminate plaintiff.

Holman and the other two human resources personnel involved in the termination decision did not become aware of plaintiff's concerns about office HIPAA violations until after they had terminated her. The other two human resources staff members and a member of the operations team certified that plaintiff was terminated for her mishandling of an altercation with a subordinate.

A-2857-21

They did not discipline Macias because they determined she had not done anything wrong.

Holman and an operations team member terminated plaintiff's employment by phone on October 5, 2018. Holman sent plaintiff a letter the same day, confirming that her employment was terminated because her "behavior as an Office Supervisor [was] inappropriate and promoted a hostile and unprofessional work environment that are in direct violation of [Barnabas's] standard of workplace conduct."

## II.

On September 27, 2019, plaintiff filed a complaint alleging defendants violated CEPA by terminating her for reporting the HIPAA violations to Salese. On April 28, 2022, the trial court heard argument on defendants' motion for summary judgment and issued an oral decision on the record, which was incorporated into an order filed that same day.

The court found plaintiff failed to present evidence of a causal nexus between her alleged whistleblowing and termination because Salese lacked authority to terminate an employee and there was no evidence that the individuals who made the decision to terminate plaintiff were aware of her whistleblowing. The court also found plaintiff failed to present competent

10

evidence that Barnabas's stated reason for her termination was pretextual, finding it was "beyond dispute" plaintiff was terminated because of her inappropriate handling of the altercation. Because there was no genuine issue of material fact, the court entered summary judgment in favor of defendants.

Plaintiff appeals, raising the following issues for our consideration:

> I. THE TRIAL COURT ERRED IN FINDING THERE WAS NO CAUSAL CONNECTION BETWEEN PLAINTIFF'S PROTECTED CONDUCT AND PLAINTIFF'S RETALIATORY TERMINATION AND/OR THAT NO REASONABLE JURY COULD CONCLUDE THAT PLAINTIFF WOULD NOT HAVE BEEN TERMINATED BUT-FOR HER CEPA PROTECTED CONDUCT.
>
> A. Legal Standard Under CEPA and HIPAA.
>
> B. The Trial Court Ignored the Inconsistencies and Implausibilities in Defendants' Arguments and Erred in Assuming that Salese Could Not Have Wanted to Retaliate Against Plaintiff for Objecting to Violations of HIPAA in His Office and that Salese Could Not Have Influenced Defendant Barnabas' Decision to Terminate Plaintiff With a Retaliatory Motive.
>
> II. PLAINTIFF ESTABLISHED LIABILITY UNDER THE "CAT'S PAW" THEORY THAT PERSONS WITH KNOWLEDGE OF HER CEPA PROTECTED CONDUCT CONTRIBUTED TO THE DECISION TO TERMINATE HER EMPLOYMENT, EVEN THOUGH THEY LACKED FORMAL DECISION-MAKING AUTHORITY.

11

III. DEFENDANTS FAILED TO MEET THE SUMMARY JUDGMENT STANDARD.

The purpose of CEPA is "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). In furtherance of that goal, the statute states in relevant part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> . . . .
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care; [or]
>
> . . . .

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3.]

"CEPA is a remedial statute that 'promotes a strong public policy of the State' and 'therefore should be construed liberally to effectuate its important social goal.'" Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont, 138 N.J. at 431).

The framework for proving a CEPA claim follows the same structure as a claim filed under the Law Against Discrimination, N.J.S.A. 10:5-1 to -2. Abbamont, 138 N.J. at 418. Consistent with that approach, New Jersey courts also look to Title VII cases as precedent. Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 290 (App. Div. 2001).

An employment retaliation claim can be advanced on a "pretext" theory, or a "mixed-motive" theory. Fleming v. Corr. Healthcare Solutions, 164 N.J. 90, 100 (2000) (quoting Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 (3d Cir. 1995)). The difference between the two "lies in the directness of proof" demonstrating the causal connection between the retaliation and adverse employment action. Id. at 100-01. "In a mixed-motive case, 'direct evidence of discriminatory animus leads not only to a ready logical inference of bias, but

also to a rational presumption that the person expressing bias acted on it.'"  Id. at 101 (quoting Starceski, 54 F.3d at 1097).

As discussed further below, the circumstantial nature of plaintiff's proof of retaliatory animus made this a pretext case.  "Where the plaintiff proceeds on a 'pretext' theory, proof of [retaliatory discharge] involves" three stages.  Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div. 1999).  First, a plaintiff must establish a prima facie case of discrimination.  Fleming, 164 N.J. at 100.  The prima facie case creates a presumption of retaliatory discharge, shifting the burden of production to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.  Allen v. Cape May Cnty., 246 N.J. 275, 290-91 (2021).  The presumption dissipates upon the employer's proof of a legitimate reason for the employment action.  Bergen Com. Bank v. Sisler, 157 N.J. 188, 211 (1999).

In the final stage of the burden-shifting framework, the employee must "prove by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision."  Meade v. Twp. of Livingston, 249 N.J. 310, 329 (2021) (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 449 (2005)).  "Although the burden of production shifts throughout the process, the employee at all

phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination." Id. at 330 (quoting Bergen Com. Bank, 157 N.J. at 211).

If the employer fails to rebut the plaintiff's prima facie case with a legitimate reason, the plaintiff is entitled to summary judgment. If "the plaintiff can produce enough evidence to enable a reasonable fact finder to conclude that the proffered reason is false, [the] plaintiff has earned the right to present . . . [the] case to the jury." Zive, 182 N.J. at 449 (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)).

To establish a prima facie case of retaliation pursuant to N.J.S.A. 34:19-3(c), a plaintiff must show:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Dzwonar, 177 N.J. at 462 (quoting Kolb, 320 N.J. at 476).]

An appellate court reviews a trial court's summary judgment decision de novo, applying the same standard used by the trial court. Samolyk v. Berthe,

251 N.J. 73, 78 (2022). A trial court should deny summary judgment only where the party opposing the motion has come forward with evidence showing a genuine issue as to a material fact. R. 4:46-2(c). To determine whether a "genuine issue" of material fact exists, the motion court must

> consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. . . . If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a "genuine" issue of material fact for purposes of Rule 4:46-2.
>
> [Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540 (1995).]

For purposes of summary judgment, defendants assumed "plaintiff's alleged complaints about a HIPAA violation" were true and plaintiff had satisfied the first three prongs of her prima facie case. Thus, plaintiff reasonably believed Macias and other staff were violating HIPAA by bringing documents containing patient information to their homes; plaintiff told Salese she objected to the practice in late summer 2018; and Barnabas's termination of plaintiff's employment on October 5, 2018, was an adverse employment action. Consequently, the determinative issues were whether plaintiff introduced

16

sufficient prima facie evidence of a causal connection and competent evidence of pretext to survive summary judgment.

We first address whether a mixed-motive framework applied here. Because the trial court found plaintiff failed to produce direct evidence of a retaliatory motive, it limited its evaluation of plaintiff's case to a pretext model. On appeal, plaintiff primarily argues this is a pretext case, but also suggests it is mixed-motive. The fact that the employer considered more than one factor in its decision to fire plaintiff does not entitle her to the burden-shifting framework of a mixed-motive analysis, nor does it foreclose plaintiff from proceeding on a pretext theory.

The distinction between the two theories lies in the directness of proof of discrimination. Fleming, 164 N.J. at 100. Direct evidence can include "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude," id. at 101 (citations omitted), and which demonstrates "a direct causal connection between that hostility and the challenged employment decision." Bergen Com. Bank, 157 N.J. at 208.

As the trial court noted, plaintiff did not introduce any direct evidence of retaliatory animus and therefore it did not err in declining to evaluate plaintiff's case under the mixed-motive framework.

Plaintiff next contends she presented sufficient evidence to support the inference of a causal link between her whistleblowing and termination, pursuant to the "cat's paw" theory of liability, and that the court's finding to the contrary was in error. The trial court acknowledged the "cat's paw" theory has not been explicitly adopted by our Supreme Court but declined to make any determination as to whether it applied to this case. Instead, the court found plaintiff could not show a causal connection because Salese lacked firing authority and did not recommend plaintiff's termination; the court also found the individuals with such authority were not aware of plaintiff's whistleblowing activity to Salese. The court further determined a causal connection could not be established by either Barnabas's disparate treatment of plaintiff and Macias following the altercation, or by inconsistencies in defendants' statements regarding the decision to terminate plaintiff.

"The evidentiary burden at the prima facie stage is 'rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination <u>could</u> be a reason for the

A-2857-21

employer's action.'" <u>Zive</u>, 182 N.J. at 447 (quoting <u>Marzano</u>, 91 F.3d at 508). "Simply stated, a plaintiff has established a prima facie case when" she has introduced sufficient evidence to support the inference "that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." <u>Bowles v. City of Camden</u>, 993 F. Supp. 255, 265 (D.N.J. 1998) (citing <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 576 (1978)). "[T]he prima facie case is to be evaluated solely on the basis of the evidence presented by the plaintiff, irrespective of defendants' efforts to dispute that evidence." <u>Zive</u>, 182 N.J. at 448.

"The cat's paw theory of liability applies to 'a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" <u>Meade</u>, 249 N.J. at 334 (quoting <u>Marshall v. Rawlings Co. LLC</u>, 854 F.3d 368, 377 (6th Cir. 2017)). Our Supreme Court has never explicitly adopted the cat's paw theory of liability. <u>See, e.g.</u>, <u>Battaglia</u>, 214 N.J. at 559 n.10 (eschewing adoption of the theory in favor of "rely[ing] on our existing case law for guidance of our courts.") However, it has endorsed the underlying premise: a causal connection can be demonstrated by proof that "a non-decisionmaker's

discriminatory views impermissibly influenced the decisionmaker to take an adverse employment action against an employee." Meade, 249 N.J. at 336.

Most recently, in Meade, the Court declined to adopt cat's paw because the plaintiff's allegation of discriminatory beliefs was that of her subordinate and consequently did not implicate the theory. Id. at 334. Instead, the Court affirmed the holdings in Battaglia and Spencer v. Bristol-Meyers Squibb Co., 156 N.J. 455 (1998), as authority for the proposition that

> unlawful employment discrimination—whether based on gender or on the exercise of protected conduct—can be predicated on claims that a non-decisionmaker's discriminatory views impermissibly influenced the decisionmaker to take an adverse employment action against an employee. In other words, actions taken to accommodate discriminatory views can support liability to the same extent as actions taken based on personally held discriminatory views [of decisionmakers].
>
> [Meade, 249 N.J. at 336.]

Noting the equivalence of LAD's causal connection requirement to CEPA's, the Court in Battaglia stressed

> that a jury could also find that an employee had demonstrated the requisite causal link indirectly. That is, . . . proof that a supervisor who did not have the authority to subject the complaining employee to a retaliatory employment action but who prepared a biased evaluation because of the employee's CEPA-

> protected complaints might have sufficiently tainted the view of the actual decision maker to support relief.
>
> [214 N.J. at 559 (citing Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)).]

Plaintiff does not argue, nor does the record support, that the decision to fire her was based on the retaliatory animus of any of the actual decisionmakers. Consequently, her CEPA claim rises and falls on Salese's retaliatory animus, stemming from the HIPAA complaint she made to him in summer 2018. However, there is nothing to support this contention because Salese did not recommend or ask plaintiff to be fired; he only requested her transfer from the West Orange location. The lack of proofs in this case stand in stark contrast to the facts in Battaglia, where the subject of the whistleblowing activity participated in a human resources meeting discussing plaintiff's employment, recommended plaintiff's firing, and prepared a file about some of plaintiff's transgressions which was "reviewed and considered" by one of the decisionmakers. 214 N.J. at 550 n.6. Here, nothing in the record supports the inference that Salese's request to transfer plaintiff influenced the decision to terminate her.

Plaintiff next argues the court erred in finding that her termination was not pretextual because she submitted evidence showing "weaknesses,

implausibilit[ies], inconsistencies, incoherencies, and contradictions presented in [d]efendants' narrative," sufficient to support the inference that the purported reason for her firing was pretextual. In the alternative, plaintiff argues that she has produced sufficient evidence to support a finding that retaliation "made an actual difference in [defendants'] decision." Plaintiff also contends the trial court erred in affording defendants the favorable inference that plaintiff's objection to HIPAA violations could not have motivated her termination.

The trial court found defendants had carried their burden of showing a legitimate, nondiscriminatory reason for plaintiff's termination: her "inappropriate handling of an altercation with a subordinate on September 26[], 2018." The court also found that defendants' disparate treatment of plaintiff and Macias following the altercation and the inconsistencies in defendants' statements regarding the decision to terminate plaintiff did not show pretext.

A plaintiff can defeat a motion for summary judgment "by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." DeWees v. RCN Corp., 380 N.J. Super. 511, 528 (App.

22

Div. 2005) (italicization omitted) (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994)).

Even if plaintiff had established a prima facie case sufficient to create a fact question as to whether Salese's recommendation to transfer plaintiff was motivated by retaliatory animus, her claim would still fail because there is no evidence to suggest that the decisionmakers based their decision to fire plaintiff on Salese's recommendation rather than their investigation into the altercation. As such, plaintiff cannot prove pretext by showing that retaliation was more likely than not a motivating cause of her termination.

Plaintiff argues Salese's proffered reason for her transfer is not worthy of credence because it was based, either in whole or in part, on Macias's version of the altercation, which was untrustworthy. She also points to inconsistencies in Salese's and Holman's testimony regarding the investigation and termination decision as a means of discrediting the proffered reason for it.

To discredit the employer's proffered reasons for an adverse employment action, a plaintiff

> must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them "unworthy of credence," and hence infer "that the

employer did not act for [the asserted] non-discriminatory reasons."

[Fuentes, 32 F.3d at 765 (alteration in original, citations omitted).]

"'[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional' retaliatory action." Fleming, 164 N.J. at 101 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).

Plaintiff asserts Salese must have based his recommendation on Macias's version of the account because the altercation had ended before he entered the room. The only witness testimony substantiating this contention was her own, while ample testimony contradicted it. Salese testified plaintiff and Macias were yelling when he entered the room, he tried to intercede and, when neither employee obeyed his repeated demands to stop, he directed a staff member to call the police. Macias's testimony and McSorley's statement relay the same sequence of events.

And even if Salese's recommendation had been influenced by Macias's account, plaintiff's assertion that Macias's account was not credible is unconvincing and inconsequential. Plaintiff's primary basis for arguing that Macias's account is unworthy of credence is that it contradicts plaintiff's version. She also claims there are inconsistencies between Macias's testimony about an

unrelated racist interaction with another employee and Macias's description of that same interaction contained in her email.

Even if Macias had fabricated information, which Salese then used as a basis for his recommendation, that fact alone would not impugn the decision to fire her, since no evidence was presented suggesting that Salese had reason to disbelieve Macias's account. See Falco v. Cmty. Med. Ctr., 296 N.J. Super. 298, 309 (App. Div. 1997) ("The mere fact that plaintiff, in her certification, denied committing the acts that constituted defendant's reason for termination does not raise a genuine issue of material fact. The dispositive issue is whether defendants had a good faith belief that plaintiff committed these acts and considered those acts in reaching their decision to terminate plaintiff.").

Moreover, Salese's proffered reason was consistent and substantiated by direct evidence. Salese testified that he recommended plaintiff's transfer based on her exacerbating the altercation rather than de-escalating it. These facts were based on Salese's firsthand knowledge of the incident, not on Macias's account. And according to Holman's testimony, every eyewitness account other than plaintiff's described plaintiff's yelling at Macias and failing to heed Salese's repeated requests to stop. Thus, plaintiff cannot overcome Salese's reason for recommending her transfer with mere "'metaphysical doubt as to the material

25

facts.'" Triffin v. Am. Int'l Group, Inc., 372 N.J. Super. 517, 523-24 (App. Div. 2004) (quoting Big Apple BMW, Inc. v. BMW of N. America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)).

Plaintiff also argues Salese's angry reaction to her HIPAA complaint, and defendants' disparate treatment of her and Macias, supports the inference that her whistleblowing was a determinative factor in Salese's decision to request her transfer. To prove pretext by showing discrimination was a motivating factor, a plaintiff does not need to show retaliatory discrimination was the employer's "sole or exclusive consideration" in deciding to fire her. Meade, 249 N.J. at 330 (quoting Bergen Com. Bank, 157 N.J. at 211). Rather, the plaintiff need only show that her whistleblowing was more likely than not "a determinative or substantial, motivating factor in . . . [the] decision . . . that it made a difference." Donofry, 350 N.J. Super. at 296. See also Puglia v. Elk Pipeline, Inc., 226 N.J. 258, 283 (2016) (quoting with approval the CEPA model jury charge "if the employer would have made the same decision in the absence of the plaintiff's whistleblowing activity, then the employer wins.") "[I]n evaluating whether an employer acted pursuant to a retaliatory motive, jurors are permitted to draw an inference from all of the circumstances relating to the decision," including the response of the plaintiff's superiors to the whistleblowing activity. Battaglia,

214 N.J. at 558-59 (noting jury could infer complicity where whistleblower's supervisor ignored the complaint or limited the investigation to questioning the accused).

The only testimony that suggested Salese reacted angrily to plaintiff's HIPAA complaint was her own description of the interaction: "I said, well, they still can't take information home. And it was his practice. It was his way or no way. I didn't have a say in that. He didn't want to . . . hear it." However, plaintiff also testified that the actions she believed were violative of HIPAA ceased after she brought the issue to Salese's attention.

Plaintiff's other testimony—and the record as a whole—overwhelmingly discredited any inference Salese was hostile to HIPAA compliance. Plaintiff testified Salese had approached her about his own concern regarding a reoccurring HIPAA violation, and Barnabas resolved the issue the following week. Plaintiff also described her monthly staff meetings, which Salese attended, where she regularly discussed HIPAA compliance and violations. Additionally, Burnett testified that she regularly raised HIPAA compliance issues to Salese throughout the nineteen years they worked together.

Salese testified that he recommended plaintiff's transfer but not Macias's because plaintiff, as the supervisor, should have de-escalated the altercation with

Macias, her subordinate. The expectation that a supervisor will not get in a shouting match with her subordinate is a reasonable one, and plaintiff's bare contention that the disparate job titles do not justify disparate treatment is unavailing.

Finally, plaintiff's contention the trial court erred in affording defendants the favorable inference that they would not have fired plaintiff for objecting to HIPAA violations is without merit, since plaintiff failed to show a genuine issue of fact to suggest otherwise. The evidence negating the inference that Salese was hostile to HIPAA compliance "'is so one-sided that [defendant] must prevail as a matter of law'" on the issue of whether his recommendation was motivated by the one HIPAA complaint plaintiff made to him in late summer 2018. Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986)).

To the extent we have not expressly addressed any issues raised by defendant, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2857-21